TEXAS & NEW ORLEANS RAILROAD COMPANY V.
MRS. NELLIE BURDEN.

No. A-1045. Decided June 25, 1947.
Rehearing overruled July 16, 1947.
(203 S. W., 2d Series, 522.)

*R. E. Minton,* of Lufkin, *Baker, Botts, Andrews & Walne* and *Roy L. Arterbury,* all of Houston, for petitioner.

*Campbell & Foreman,* of Livingston, *Collins, Dies, Williams & Garrison,* and *C. S. Williams,* all of Lufkin, for respondents.

Mr. Justice Slatton delivered the opinion of the Court.

Mrs. Nellie Burden recovered a judgment for the death of her husband in the sum of $17,950.00 against the Texas & New Orleans Railroad Company. The jury made the following findings:

1. The operators of defendant's passenger train on the occasion in question approached and passed over said crossing, where deceased was struck and killed, at a greater rate of speed than a person of ordinary prudence, in the exercise of ordinary care, would have operated same, and such negligence was a proximate cause. 2. The engineer and fireman in charge of the operation of said train as it approached said crossing failed to blow the whistle, etc., where the deceased was struck and killed, and such negligence was a proximate cause. 3. That the engineer and fireman in charge of the operation of defendant's locomotive failed to begin ringing the bell, etc., away from the crossing where deceased was struck and killed, and failed to continue to ring the same until said locomotive had passed over the public crossing where deceased was struck and killed, and such negligence was a proximate cause. 4. The south end of the string of freight cars standing on the side track north of the crossing was immediately at the north edge of the crossing on the occasion in question and such acts were negligence and a proximate cause. 5. As said passenger train approached the crossing where deceased was killed the fireman discovered and saw the deceased walking or moving onto said main line track as if to cross thereover. 6. Said fireman failed to signal the engineer to stop or reduce the speed of said train after so discovering the deceased, and such failure was negligence on the part of the fireman and a proximate cause. 7. After the passanger train in question neared the crossing the deceased was in a situation of imminent peril of being struck by the passenger train. 8. The fireman on said locomotive of said train discovered the deceased in such situation of imminent peril and realized such peril, and the fireman and the engineer of the train crew in charge of said locomotive, by exercising ordinary care in the use of means then at their command such as, etc., could have avoided striking the deceased by said locomotive. 9. After such discovery and realization of the deceased's peril, the persons operating such locomotive failed to exercise ordinary care in making use of such means then at their hands to warn the deceased or to slow down the speed of such train, and such failure was negligence

and a proximate cause. 10. As fair and reasonable present compensation to the survivor of the deceased, the damages were found to be $17,950.00. 11. The deceased did not fail to keep a proper lookout for the passenger train. 12. The deceased did not deliberately jump in the middle of the main line track directly in front of an approaching passenger train. 13. The brakeman did not warn the deceased not to go on the main line track in front of the approaching train. 14. The failure of the deceased to wait a brief minute or two to allow the passenger train to pass by before attempting to cross the main line track was not negligence. 15. The deceased was not negligent in entering upon the defendant's main line track without assuring himself that he would have time to get across said track before being struck by the train.

The railroad company, being dissatisfied with the judgment of the trial court, appealed the case to the Beaumont Court of Civil Appeals. The Beaumont Court sustained the contention of the railroad company that there was no evidence in the record to support the submission of the case to the jury upon the issue of discovered peril, but affirmed the case because in its opinion the other points of error of the railroad company could not be properly sustained. 196 S. W. (2d) 707.

The deceased was killed by a passenger train while he was attempting to cross the railroad's main line track at a grade crossing near the station at Diboll. The deceased Mr. Burden operated a place of business near the crossing where the accident occurred. His residence was in the second story of the place of business. He had operated this business about seven years prior to the accident. The tracks at Diboll are situated mostly north and south through the town of Diboll, although the trains are designated by the railroad company as east and west bound. The tracks consisted of a main line and a side track. The side track is located on the east side of the main line. Before the accident a freight train going east or north pulled onto the side track at Diboll for the purpose of meeting a passenger train and thereafter to set out and pick up some box cars. The freight train, after clearing its caboose of the main line, cut its engine and eleven box cars so as to open the grade crossing where the accident occurred for the use of those desiring to cross the tracks of the railroad at the grade crossing. The head brakeman cut off the engine and eleven box cars and the rear brakeman of the freight train came north or east along the remaining box cars to the grade crossing for the purpose of warning the public of the approach of the passenger

train at the grade crossing. Immediately south of the grade crossing there was an immigrant car in the freight train. The car was not the ordinary box car. It was a stock car. In the immigrant car were household goods, horses, chickens and cows, together with the owner thereof. While the freight train was waiting for the passenger train, Mr. Burden and two others came to the east side of the immigrant car and engaged in conversation with the immigrant. Mr. Burden, immediately before the accident, left the east side of the immigrant car, walked north to near the end of it, turned to his left and walked across the side track into the space between the side track and the main line, looked at the flagman and then to his right toward the oncoming passenger train and made from one to two steps onto the main line track, where he was killed by the passenger engine. Mr. Burden was approximately 47 years of age and appears to have had all of the usual senses.

We quote from the evidence. A witness offered by Mrs. Burden gave the following testimony:

"Q. When was it he looked and saw the passenger train? (having reference to Mr. Burden.)

"A. About the time he got over the first rail.

"Q. Did he make an effort to jump back?

"A. He throwed up his hands and the train hit him.

"Q. Did he ever get past the first rail toward the center?

"A. Yes.

"Q. After he looked and saw the train at the first rail, instead of jumping off the track he stepped in the center of the track and throwed up his hands?

"A. Yes, about there.

"Q. After he looked and saw the passenger train when he was about at the first rail, which would be the east rail of the main line, did he turn and face the passenger train and throw up his hands, or which direction did he face when he threw up his hands?

"A. He was facing the passenger train when he throwed up his hands.

＊　　＊　＊　　＊　　＊　　＊

"Q. Did the brakeman make any effort or do anything to lead you to believe he was trying to stop the man from getting on the track?

"A. He hollered at him.

"Q. Where was he when he hollered at him?

"A. He was close to the rail, close to the main line track, closer to it than the other.

"Q. Where was the negro brakeman when he hollered at Mr. Burden?

"A. Near the main line.

"Q. Was he in front of or behind him.

"A. The negro must have been in the center of the main line.

\*    \*    \*    \*    \*    \*

"Q. Where was the brakeman when you first saw him?

"A. About here, I believe.

"Q. He was in the act of flagging when you first saw him?

"A. He was flagging.

"Q. What direction was he facing?

"A. Kinda toward me. He was looking toward Mr. Burden.

"Q. Did Mr. Burden pay any attention to him, or keep walking?

"A. I believe he did, he kept walking. He stepped up pretty pert.

"Q. How far had he got before he stepped up pretty pert?

"A. One or two steps and off the switch.

"Q. When he got about off the switch did he go faster or slower, or what did he do?

"A. Me moved tolerably fast.

"Q. Which way was he looking?

"A. Toward the negro."

Mrs. Burden offered the following excerpts of a deposition of the passenger train engineer:

"Q. As you neared the crossing, you say this negro brakeman gave you a signal of some kind?

"A. Yes, sir. He was protecting the highway. Whenever you cut a crossing like that and there is very little view, one member of the crew will get on the crossing and keep traffic from coming across. He was standing on the highway and reached up and gave what we call a high ball and I answered.

\*    \*    \*    \*    \*    \*

"Q. I mean where was your train with respect to the crossing?

"A. Well, it was probably four or five hundred feet.

"Q. North of the crossing?

"A. Yes.

"Q. When the brakeman gave you the high ball, you say your engine was four or five hundred feet away?

"A. The best I can judge, about five hundred feet. Of course it has been three years ago, and accidents happen all along.

"Q. It is customary when you blow for a crossing and a brakeman is there and the way is clear, he gives you a high ball?

"A. Yes, if there was nobody on the crossing I would have slowed down to where I could stop; that is protection for us and the highway, that is why he is placed there. If he had not been there, I would have slowed down to where I could stop."

Mrs. Burden offered the following testimony of the fireman on the passenger train, which was taken from his deposition:

"Q. Did you see the negro brakeman there?
A. Yes, sir.
"Q. Was he standing there as the man went upon the track?
"A. Yes, sir.

\*     \*     \*     \*     \*     \*

"Q. What did you see first, the negro brakeman giving you a high ball sign or did you see the man approaching from your left as if to go over the crossing; which did you see first, if you remember?
"A. I saw the brakeman first, I expect. I am not sure.
"Q. Where was he when your engine passed the crossing? Was he on the righthand side of the train or your lefthand side?
"A.He was on the lefthand side when we passed.
"Q. If you did not think he had time, why didn't you give the engineer a signal?
"A. We were too close on him. I actually thought the man was going to stop there and watch the brakeman on the crossing.
"Q. You didn't have the slightest suspicion you had hit the man?
"A. No, sir."

Another witness called in behalf of Mrs. Burden testified:

"Q. After Mr. Burden came east over the crossing, how long was it from then until you saw him on the crossing again?
"A. A short while.
"Q. Give us your best judgment as to how many minutes.
"A. Not more than twenty minutes, if that much.
"Q. When he came back to the crossing, where was he when you first saw him?
"A. I just saw the bulk when the passenger train threw him up.
"Q. You saw him when he was hit?
"A. Yes.
"Q. Where was he when he was hit?
"A. Across the railroad, between the passenger - -.
"Q. Was he on the main line or siding?

"A. The main line.

"Q. Where?

"A. Just enough for the train to hit him.

"Q. What did it do to his body?

"A. Tore it up pretty bad. It was as far from the crossing as the wall younder where they found him.

"Q. What first attracted your attention to the crossing after you saw him go to the crossing and later saw the train hit him?

"A. There was a little child coming ahead of the traffic, and I was watching the child to see if the cars were going to kill it. I saw it go up the steps at Burden's store. As I looked back the passenger came along and hit him.

"Q. Did you see a negro brakeman or a negro flagging the traffic, protecting the child or doing anything at the crossing?

"A. No."

\*  \*  \*  \*  \*  \*

"Q. Can you tell about where the passenger train was that day after you saw it come from the north, how far from your house was it when you first noticed it?

"A. A little ways, I don't know.

"Q. It didn't blow or ring the bell to let anybody know it was coming?

"A. Just the roaring of the train.

"Q. How far could you hear the roaring of the train?

"A. A hundred yards.

"Q. What is your best impression about how far up the track you could hear it coming?

"A. Two hundred yards, maybe.

"Q. You think it was about that far when you noticed it coming?

"A. Yes.

The following testimony was given by the same witness by questions asked by Mrs. Burden's counsel:

"Q. Just before Mr. Burden was hit you heard a noise from the freight train?

"A. Like when they go to couple up, and that was all I heard. I figured it was going to couple up and pull out about the time it made that noise and about the time it made the noise the passenger train came by and hit him."

The railroad company offered the following testimony:

"Q. You could finally hear the train coming?

"A. Yes, and about that time Mr. Burden made the remark 'That is 25 coming. I believe I will be going. I will be seeing you', and he walked away from the door at that moment.

"Q. That was after you heard the passenger train coming and whistled?

"A. Yes.

"Q. Mr. Burden said what?

"A. 'That is 25 coming and I will be going. I will see you some other time', just like that.

"Q. What hid he do then?

"A. Started toward the end of the car toward the road.

"Q. What did you do?

"A. I was figuring on getting out of the car when he came up. I did not get out. At the moment he left the door I stepped to the other side and opened the door out and seen the train coming right on me and changed my mind about getting out.

"Q. When you got over to the other side, I will ask you whether or not you saw a flagman out there anywhere?

"A. He was out in the road beyond the end of my car, by the side of the train.

"Q. What was he doing?

"A. About that second I heard him say 'Stop, Mister', and had both hands up. He said 'Stop, Mister, that train is coming' (indicates).

"Q. You are holding up your hands above your head in front of you?

"A. Yes, one hand was higher than the other and one was motioning him. It happened so quick (indicates).

"Q. Did Mr. Burden stop?

"A. It seemed like he hesitated and then made a lunge and I never seen any more. It seemed like it closed around. I seen the side of the cars and stepped back and shut my door.

"Q. Did you see him the moment the train hit him?

"A. Yes, sir, that is what called my attention. I seen the brakeman saying 'stop', the train is coming, and I seen he hesitated in his stride and made one step in front of the train."

On cross examination the same witness testified:

"Q. The point is, where was he with respect to Mr. Burden? If he flagged him where Mr. Burden could not see him, it would have done no good.

"A. Mr. Burden heard him, because he said stop, and Mr. Burden stopped momentarily and leaped in front of the train.

"Q. Where did the negro run from?

"A. He was out there.

"Q. You said the negro ran out and threw up his hands, where did he run from?

"A. He was on the track somewhere and on the crossing.

\*  \*  \*  \*  \*  \*

"Q. Did the two boys remain in the same spot from the time he got there until after the wreck?

"A. I don't recall them.

"Q. Did you see them when they went out of your sight?

"A. They walked down the road.

"Q. How long had they been gone when Mr. Burden left?

"A. Not over a minute or two, a minute or so.

\* \* \* \* \* \*

"Q. Do you know the direction they went from having seen them?

"A. They left in a northerly direction down the road, the way the train runs, and they had come from the crossing up to the car.

"Q. When they got to the crossing, did they turn right or left?

"A. I could not say that.

"Q. Did you see him give a high ball signal to the passenger?

"A. No.

"Q. You did not see it?

"A. No.

"Q. Did you see the negro give any signal of any kind of character except the one you say that he threw up his hands and said stop?

"A. No.

"Q. When he told Mr. Burden the train was coming and Mr. Burden stopped and hesitated and looked in what direction?

"A. The approaching train.

"Q. When the negro told him the train was coming, did Mr. Burden act like it was his first knowledge of the approaching train?

"A. I wasn't close enough to tell. He knew the train was coming.

"Q. How do you know?

"A. He made the remark that 25 was coming."

The following testimony is taken from the colored brakeman, which was offered by the railroad company:

"Q. Richard, had you been there at the crossing on one side and the other before the train came?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. As the train came toward the crossing, did you give any sort of signal to the train?

"A. Yes, sir.

"Q. What signal did you give?

"A. I gave the high ball.

"Q. High ball signal?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Where were you the best you remember when you first gave that signal?

"A. On the west side of the main line.

"Q. That would be toward Burden's store.

"A. Yes.

"Q. Dou you remember how long it had been since you walked over there?

"A. I can't recall now, but I know I was on that side.

"Q. What did you next do?

"A. Came ahead of the passenger train toward the east side of the main line.

"Q. Had these cars stopped that had come up to the crossing (meaning automobiles)?

"A. The man behind me had stopped and I still had my hand up to the traffic.

"Q. The car you stopped back of you, was that on Burden's side?

"A. Yes.

"Q. You were walking toward the east side?

"A. Yes.

"Q. There was a car coming to the crossing at the east side?

"A. It was just approaching (Tatum's car, who testified on behalf of Mrs. Burden).

"Q. What did you do when you saw that car approaching?

"A. Held up my hands this way and said 'hold it'.

"Q. You held up both hands in front of you with your palms facing the car, indicating to them to stop?

"A. Yes, as I walked back I kept my hands up as I walked across the track.

"Q. Did the car coming up to the crossing heed that warning, did it stop?

"A. Yes.

"Q. At the time you gave the high ball to the passenger train, was there anybody there in danger on the crossing?

"A. Well, there wasn't anybody there right then. I had the traffic stilled is the reason I gave him the signal.

"Q. The crossing was clear at the time?

"A. Yes.

"Q. Did you see Mr. Burden before he got hit?

"A. Yes, sir.

"Q. Tell the jury whether or not you saw him leaving the box car, going back to the west toward his store.

"A. I saw Mr. Burden come around from that door. He came around the end of the car ten or twelve feet from the bed of the crossing, maybe a little more. When he came around from the car I noticed him and said 'hold 'em'.

"Q. Put up both hands as you said 'hold 'em'?

"A. Yes, this way (indicating) and he came around then with a rapid speed and hesitated, slowed up a little bit and then started for the crossing and me still hollering hold 'em.

"Q. Was the passenger train still approaching then?

"A. Yes.

"Q. As you hollered to him the last time when he hesitated, can you give us your best impression of how close the passenger was then?

"A. The last time I hollered, according to the way they collided, it must have been a hundred feet of him.

"Q. How many steps did it take him when you told him the second time to get on the track?

"A. It looked like he made about three long steps and landed in the center of the track.

"Q. Tell the jury whether or not, after he came around the end of the car and came from the side into the space between the siding and the main line he looked to his right or left.

"A. He kinda looked to the right.

"Q. Is that the direction the train was coming?

"A. Yes.

"Q. Did he ever stop, come to a dead stop? You say he hesitated. What do you mean by hesitating?

"A. When he left this door he left kinda fast, and then when I said 'hold 'em', he slowed down and not going quite as fast, and then he decided he would go a little faster and went faster.

"Q. Did you make two attempts to stop him?

"A. Yes, I hollered 'hold 'em'.

"Q. Did he heed your warning, the last warning you gave him, did he stop?

"A. No.

"Q. What did he do?

"A. He made a leap.

"Q. You say a leap, what do you mean?

"A. He jumped with one foot.

"Q. Get out in front and show us.

"A. (Witness indicates) He looked around like that and jumped like this.

"Q. Where did he land then?

"A. In the middle of the track between the two main line rails.

"Q. Is that where the train hit him?

"A. Yes.

"Q. You are positive he was at the door of the car when you saw him first?

"A. Yes, sir.

"Q. He was there with three different people, the man accompanying the car and the two who had come up there?

"A. The man who accompanied the car was inside the car and Mr. Burden and two men were standing at the door.

"Q. They were at the door where Mr. Burden was?

"A. Yes, sir.

"Q. They remainded there as far as you could tell until the accident happened?

"A. No, they came around the corner of the car. These two gentlemen taken heed to my telling them the train was approaching.

"Q. You didn't know the young man's name was Leonard, one of them?

"A. I taken a young man's name, I believe he said Leonard.

\*      \*      \*      \*      \*      \*

(Leonard was called by the railroad company).

"Q. The two young men you saw there didn't remain in the same place you first saw them, but moved north and came around the end of the car and you had to flag them?

"A. I did flag them.

"Q. Did they heed your warning?

"A. Yes."

In the discussion of the case we must assume, as the jury found upon conflicting evidence, that the railroad company is guilty of primary negligence in the respects above stated in the verdict of the jury. It should be noted also that we agree with the Court of Civil Appeals in its holding that there is no evidence in the record to support the finding of the jury upon the theory of discovered peril.

■ It has been many times stated in this Court that the general rule is that the question of whether there is negligence is one of fact to be decided by the jury. The general rule stated is applicable in cases of primary negligence as well as in cases of contributory negligence. In rare cases, to which we think this one belongs, where the evidence is without material dispute and where only one reasonable inference may be drawn therefrom, the question of negligence becomes one of law.

■ It is elemental that Mr. Burden, being in possession of his mental faculties, was charged with knowledge that the railroad crossing was a dangerous place and in going upon it he was charged with such care as an ordinary prudent man would have used under the same or similar circumstances. Where one who uses a railroad crossing exercises no care whatever for his

own safety, he is guilty of contributory negligence as a matter of law. In such cases a recovery is always denied unless there is evidence in the record to support a recovery upon the doctrine of discovered peril.

We think the undisputed evidence compels the following conclusions: Mr. Burden knew the passenger train was about to use the main track over the grade crossing at or about the time he left the east side door of the immigrant car; that the colored brakeman was on the crossing for the purpose of stopping traffic which was about to use the grade crossing over the railroad tracks. Mr. Burden left the east side of the immigrant car, went north to a point at or near the north end of the car, turned left and across the side track, at which time the colored brakeman called to him for the purpose of stopping him from using the grade crossing over the main line track. Mr. Burden heeded the brakeman's warning momentarily, thereafter substituted his judgment for that of the flagman, and proceeded to attempt to cross the main line track ahead of the passenger train.

This case is ruled by the law announced in the case of Gulf, C. & S. Ry. Co. v. Gaddis, 208 S. W. 895, from which we quote the following:

"All men in possession of their faculties are charged with knowledge that a railroad track is a dangerous place, and the law will not permit them to go upon the track, even at a public highway, without being charged with a recognition of the danger attending such action and the use of such care as ordinary prudence would dictate in so doing. Where no care whatever has been exercised, our courts uniformly hold that contributory negligence exists as a matter of law, and recovery is denied. What acts of prudence as constituting ordinary care are required is usually a question of fact. Had Gaddis, upon aproach-the crossing, seen the train at an approximate distance of 60 or 70 feet, when he himself was some 15 feet from the track, and in good faith believed, judging from the distance and speed of the train, that he had ample time to cross in safety, it may be under the circumstances, that a jury would be warranted in finding that he was not guilty of negligence. He was a resident of Ft. Worth, and no doubt knew of the ordinance, and had the right to assume that the train was not running in excess of the speed limit, unless, from his observation and all the surrounding circumstances, such assumption was not warranted. This seems to be the holding in the case of Railway v. Wagley, 15 Tex.

Civ. App. 308, 40 S. W. 538, cited by plaintiffs. We do not believe, however, it is reasonable to acquit Gaddis of negligence, where the additional fact exists. that the flagman placed by defendant for the purpose of preventing injury warned him against the venture. We have not found any case by our Supreme Court deciding this question; but the decisions of other jurisdictions, in so far as they have come to our knowledge, are all to the effect that, under such circumstances, no recovery can be had. Borglum v. Ry., 90 Conn. 52, 96 Atl. 174; Ry. v. Nichols, 74 Ill. App. 197; Ry. v. Batson, 81 Ill. App. 142; Ry. v. Williams, .87 Ill. App. 511; Ry. v. Sink's Adm'r., 118 Va. 439, 87 S. E. 740; Emery v. Ry., 173 Mass. 136, 53 N. E. 278; Hanson v. Ry., 62 N. J. Law, 391, 41 Atl. 868; Oberdorfer v. Ry., 149 Pa. 6, 27 Atl. 304; Ry. v. Colvin, 118 Pa. 230, 12 Atl. 337; Cleary v. Ry., 140 Pa. 19, 21 Atl. 242; State, to use of Dyrenfurth, v. Ry., 73 Md. 374, 21 Atl. 62, 11 L. R. A. 442.

"We are constrained to hold that Gaddis was guilty of negligence as a matter of law. To do otherwise, we believe, would be the enunciation of a rule contrary both to sound policy and common experience. The right of the public to use a highway is not altogether without its restrictions and limitations. The railroad company, likewise, has its rights. Necessity requires the crossing of highways by the tracks of railways and the running of trains thereon. Danger to the public is a necessary consequence, and members of the public are required to take this into consideration in using the highway and to be governed accordingly. When a railroad company has provided at a crossing a flagman charged with the duty of knowing of the approach of trains and of the times when danger to the public in crossing the track exists, we think it unreasonable not to require users of the crossing to subordinate their own judgment to that of the flagman; and when they do not do so, and injury results, it should be at their own risk."

The respondent contends that the jury was not required to believe the witness who was in the immigrant car upon the theory that the jury has the right to believe or disbelieve all or any part of the testimony of a witness. It is the province of the jury to decide the issues which are raised by conflicting evidence, but where there is evidence upon an issue and there is no evidence to the contrary, then the jury has not the right to disregard the undisputed evidence and decide such issue in accordance with their wishes. The witness was called by the railroad company. He was not an employee of the company and, in so far as the record discloses, had no interest in the case. The fact of the two young men being at the car door with Mr. Bur-

den and the immigrant before the accident and one of them testifying in the case for the railroad, and was not interrogated as to whether he heard Mr. Burden make the remark of the coming of 25, "I must be going", etc., cannot be considered as negativing the making of the statement by Mr. Burden, or that Mr. Burden did not know the passenger train was coming. The parties did not examine the witness with reference to whether he heard the deceased make such a remark; moreover, some of the witnesses stated that the young men had left the point near the door of the immigrant car before Mr. Burden left, and their absence may explain why the witness who testified was not interrogated as to whether or not he heard Mr. Burden remark to the occupant of the immigrant car "There comes 25, I must be going".

The respondent urges that Mr. Burden's attention was distracted in two particulars, and thereby his conduct must be judged in the light of the decision of this Court in the case of Kirsey v. Southern Traction Co., 110 Texas 190, 217 S. W. 139. It is insisted that Mr. Burden did not know the passenger train was coming, that if Mr. Burden heard any whistle, it was the two short blasts given by the passenger train at a time when its engine was close to the freight engine and he believed it was a signal for the freight train to couple up and pull out; that the action of the colored flagman, although well meant, distracted Mr. Burden's attention from the oncoming passenger train. We have stated that the evidence shows without dispute that Mr. Burden, just before he left the east side of the car door to go across the railroad tracks, remarked: "There comes 25, I must be going", etc. Mr. Burden, having knowledge of the approach of the passenger train, could not, under the facts in evidence, have been distracted by the action of the colored brakeman in hollaing to him twice and holding his hands up toward him with his palms extended. The only reasonable conclusion that can be drawn from such circumstances is that Mr. Burden was unwilling to heed the warning of the colored brakeman or flagman, and thereby substituted his own judgment for that of the flagman. In such a case, no recovery is allowed where, as here, the party's action contributed to his injury.

The suggestion that Mr. Burden believed the two short blasts of the passenger which were sounded so near the freight engine as to lead him to believe the freight train was about to couple up and thereby distracted his attention from the oncoming passenger train is without merit. This suggestion seems to be predicated upon the testimony of the witness Tatum, who appeared

at the crossing on the east side of the side tracks going west in an automobile. He said that when he drove up to the crossing he heard two blasts of the whistle and thought it to be the whistle of the freight train. He further testified that he looked in the direction of the sound of the whistle and saw the passenger train coming. The railroad company introduced in evidence his statement which was made to a railroad employee some two or three days after the accident, and in the statement the witness said he heard two short blasts of the whistle, which he thought were sounded by the passenger train.

■ The lady witness who was sitting on her front porch on the west side a greater distance from the crossing than the Burden store building stated, as we have set out above, that she heard a noise from the freight train, and then gave her conclusion as to the meaning of such noise. In order to bring this case within the ruling of the Kirksey case we would be compelled to infer from the testimony that Mr. Burden heard the noise of the freight train and to draw the further inference thereon of his understanding the noise to mean, as did the lady witness, that the freight train was about to couple up and pull out. Inferences cannot be pyramided in this manner. Wells v. Texas Pacific Coal & Oil Co., 140 Texas 2, 164 S. W. (2d) 660, local citation 663, and authorities there cited. An inference may be drawn from a fact proved, but an inference may not be drawn from another inference. The three witnesses who testified and were nearest Mr. Burden at the time and immediately before the accident did not testify to any noise or movement of the freight train, hence it is not reasonable to suppose that Mr. Burden heard any such noise or saw any movement of the freight train at the time he was crossing the side track or attempting to cross the main line, as would reasonably distract his attention from the oncoming passenger train.

In the Kirksey case the attention of the injured party was distracted by a person who was on the side of the road and flagged the injured party for the purpose of obtaining a ride, thus calling the attention of the injured party away from the oncoming interurban which was about to pass over the grade crossing. The distraction was proved by the witness who flagged the injured party. In the present case we have seen that no fact or facts appear in evidence to support the theory of Mr. Burden's attention being distracted from the main line track and the oncoming passenger train. So, under the evidence, we are constrained to hold that Mr. Burden was guilty of contributory negligence as a matter of law, and since his negli-

gence contributed to his death, no recovery can be properly allowed.

Accordingly, the judgment of the lower courts is reversed and the judgment is rendered in favor of petitioner.

Opinion delivered June 25, 1947.

Rehearing overruled July 16, 1947.

MR. JUSTICE TAYLOR, dissenting.

We respectfully note herein our disagreement with the majority opinion. The following evidence statement, together with such additional testimony as may be subsequently referred to, will serve as the basis for the reasons on which the dissent is grounded: Mr. Burden was killed at one of the railroad crossings in Diboll, a town of about 4,000 population. Two tracks paralleling each other are on the company's right of way at this point, the main line on the west, and the switch track on the east. They are about 7 feet apart with a narrow space of about 22 inches between the overhang of cars of trains side by side on the crossing. Two highways parallel each other on opposite sides of defendant's right of way. The one on the east is highway 59; the one on the west, the community road. Mr. Burden's store was on the west side of the tracks about 100 feet slightly northwest of the center of the crossing. The next house north of the store was the home of Mrs. Richardson. Her testimony may be identified in the majority opinion by the reference to it there as that of "the lady witness." About thirty minutes before the accident a freight train headed north was uncoupled on the siding to await the passing of defendant's southbound passenger train, running a half hour late. The uncoupling left a small gap on the sidetrack about 40 feet in length from north to south for traffic to pass through east and west on the connecting road. The car at the south edge of the gap was an immigrant car.

Sergeant Leonard, defendant's witness, testified that he heard the approaching train whistle ("two short blasts") about 200 yards from the crossing and did not hear the bell ringing; and that when Burden came north from where he was standing in front of the immigrant car door he came "kinda" by the side of him (Leonard) and turned left toward the store; and that he (Leonard) heard the brakeman "holler" to Mr. Burden. According to Tom Tatum's testimony, Burden, when Tatum first saw him, was about the middle of the sidetrack walking to-

ward his store at "an average gait." The brakeman, Harris, then standing at the crossing, said that the last time he "hollered" at Mr. Burden the approaching train *must have been within 100 feet of him.* Tatum said he was caused to stop his automobile on the connecting road a few feet east of the crossing, by two short whistle blasts ("just two toots") ; that he thought they came from the freight train and "figured" *it was about to hook up and pull out;* but then looked both ways and saw the passenger train coming from the north. It was at that time (when he looked both ways) that he saw Burden, he said, and that immediately after, he saw the brakeman; that Burden had then got to about the west edge of the sidetrack and close to the main line when the brakeman "hollered" at him; that Burden "hesitated," quickened his gait, and moved (out of the gap on the sidetrack) "hurriedly" and was hit *close to the first rail on the main line.*

The eye witnesses to the accident (five in number) agree that deceased was struck when moving directly from the sidetrack to the main line track. They do not agree as to whether, in getting to that track, he did so by stepping "pretty pert", or in a "hurry walk", or by "jumping" or "leaping", from the sidetrack.

The brakeman, by his deposition testimony, placed Burden, when he was hit, entirely off of the community road, south of it; but in his trial testimony placed him further north and east but still further south than Tatum placed him in his trial testimony.

Mr. Patton, the caretaker of the contents of the immigrant car, said that as Burden left the door of the car walking toward the crossing, he (Patton) stepped to the opposite door and looked, "and seen the train coming right on me." He expressed his opinion that Burden *knew* the passenger train was coming and gave as his *reason* for his opinion that Burden said "25" was coming and he would be going.

Mrs. Richardson testified that neither the whistle was blown nor the bell rung at the crossing. She testified also, substantially as Tatum did, that *just before Mr. Burden was hit she heard a noise from the freight train* "like when they go to couple up"; and that *about the time it made the noise the passenger train came by and hit him.*

Five witnesses testified concerning Mr. Burden's movements just prior to the accident, as eye witnesses. Their Q & A testimony covers 168 pages of a 400 page statement of facts, including eleven photographs and four sketches of the crossing and its environing situation (offered by plaintiff) and two statement exhibits (offered by defendant). Mr. Patton came to the trial from Arkansas as a witness for defendant in response to a telephone call three years after the occurrence. Harris was still in the defendant's employ when he testified as its witness. Sergeant Leonard came as a defense witness to the trial from Ft. Sam Houston. Mrs. Richardson and Tom Tatum were witnesses for plaintiff. Mr. Burden did not survive to testify. He spoke no word after starting from the east door of the immigrant car toward the crossing (unless he said what is above referred to in Patton's testimony about "25"); hence it was necessary to consider the testimony of those who saw the tragedy for explanation of deceased's movements on the sidetrack just prior to his death, together with the existing circumstances, beginning such consideration with the presumption that Mr. Burden's movement were not motivated by an intention to commit suicide.

The trial court submitted the cause to the jury on numerous ultimate special issues involving negligence and proximate cause. The findings in response to the issues were that defendant was negligent and that plaintiff was not; that the train was running at an excessive speed; that the fireman failed to blow the whistle when the locomotive was at least 80 rods from the crossing; that it failed to blow the whistle and ring the bell as the train approached and passed over the crossing; that each of the acts of negligence mentioned, and others not necessary to mention, proximately caused Mr. Burden's death; and that he did not deliberately jump in the middle of the main track in front of the train. The trial court entered judgment on the findings for plaintiff.

The six-page statement of the testimony on which the majority ground their opinion (four pages quoted from defendant's witnesses, who saw the accident, and two from plaintiff's witnesses who saw it, together with testimony conflicting on the face of the statement, and conflicting testimony not included therein) is too voluminous for specific treatment. Suffice it to say for the purposes of this dissent that in our opinion the testimony selected does not afford a proper basis for considering the evidence. It, at most, was selected out of the 400 pages, as appears from its treatment by the majority, to be weighed

and interpreted against testimony reasonably subject to interpretation materially inconsistent with that set forth by the majority. The jury had a right to consider the evidence from the position of deceased just before and at the moment of collision, and it is incumbent on the appellate courts to consider it most strongly in plaintiff's favor, *rejecting that most favorable to defendant.* Kirksey v. Southern Traction Co., 110 Texas 190, 217 S. W. 139; Mitchum v. Chicago R. I. & G. Ry. Co., 107 Texas 34, 173 S. W. 878; Merchants Bldg. Corp. v. Adler, 110 S. W. (2d) 978; G. C. & S. F. Ry. Co. v. Gasscamp, 69 Texas 545, 7 S. W. 227; McAfee v. Travis Gas Corp., 137 Texas 314, 153 S. W. (2d) 442; Jones v. Ry. Co. (Com. App.), 243 S. W. 976; Ry. Co. v. Barron (Com. App.), 249 S. W. 825; Fry v. Dixie Motor Coach Corp., 142 Texas 589. (Par. 2), 180 S. W. (2d) 135, loc. cit., Key No. (2) p. 137; International & G. N. Ry. v. Hawthorne, 131 Texas 622 (Par. 3), 116 S. W. (2d) 1056, loc. cit. Key No. 8, 9) p. 1059. The law in this connection (when there is room in the evidence, as in the present case, for reasonable minds to differ) is concisely stated thus: "The weighing of the evidence is a matter over which the Supreme Court has no jurisdiction whatever, the judgment of the court of civil appeals being final. The court of Civil Appeals alone can overrule the findings of the jury or the trial court because contrary to the weight of the evidence." 3 T. J., and T. J. Supplements to date, Appeal and Error, Sec. 764.

Appellant company did not take the position that there was no evidence tending to show that Mr. Burden was not negligent, but contended that the evidentiary question as to whether he knew when he started toward the crossing that the train was coming, was conclusively proved. As to the ultimate question as to whether or not Burden was negligent, it was appellant's contention that the evidence *preponderated* in favor of such a conclusion. Employing the language of appellant's brief in this connection, it is that the facts *"preponderantly* show at least that the deceased was guilty of the grossest bit of death-defying *negligence* that resulted in his death." (Italics ours). In other words, appellant contended that the evidence on the whole preponderated in its favor on the special issue as to whether or not Mr. Burden was negligent. It goes without saying that if there was evidence to support the jury's finding on this issue, then it unquestionably follows that Mr. Burden's death was not proximately caused by his negligence, and that he was not guilty of contributory negligence.

There were two theories urged upon the court of civil appeals. Appellant company's theory, in its effort to set at naught

the jury finding in response to the special issues inquiring as to deceased's negligence, was that the testimony showed *conclusively* that Burden knew the train was coming because there was testimony not subject to being rejected that Burden said as he started for the crossing that "25" was coming; and that it knew Burden said "25" was coming *because Patton said he said it*, arguing in support of its theory that since Burden "knew" *it was* time for "25" to be coming, and four witnesses who were at the crossing said they "heard the train coming and heard its whistle blow," that "he (Burden) too", knew it was coming.

The theory of appellee was that there was testimony tending to show Burden did not know the passenger train was coming, and believing the freight train was about to couple up with him on the siding, moved off hurriedly to the closest zone of safety (only 22 inches in width); that in his confusion resulting from having his attention attracted away from the direction of the approaching train when the brakeman called, he went farther than the minimum necessary and found himself in the path of the oncoming train too late to avoid being hit.

The court of civil appeals held that there was testimony bearing on the evidentiary question of whether deceased had his attention thus diverted, and bearing in turn on the ultimate issues submitted to the jury inquiring whether Burden was guilty of negligence which proximately caused his death; and held in this connection that there was evidence tending to show that Mr. Burden's action, under the circumstances as they appeared to him, were not substantially different from those of an ordinarily prudent person situated as he was after he went upon the crossing. The court held that some of the *ultimate facts of negligence and proximate cause were* reasonably inferable by the jury from the circumstances in evidence considered in the light of the whole. So holding, the court affirmed the trial court's judgment entered on the findings in favor of plaintiff. 196 S. W. (2d) 707.

In view of the record as above stated, petitioner grounded its application for writ of error, not on the contention that there was no evidence raising in the trial court the issues referred to, but on the contention that *the court of civil appeals errer in not believing and in rejecting Patton's testimony that Burden said to him* that "25" was coming. So contending, petitioner made the following statement at the outset of its application for the writ:

"Our task here then is only to point out and to make clear the fact that *there is no justification* in the record for a *repudiation of the direct and undisputed testimony of a disinterested witness* that the deceased *knew the train was coming* as he approached the main line track. That fact being established, it will follow that there can be no recovery by the plaintiff *under all existing circumstances.*" (Italics ours).

Writ of error was granted with that doubt incident to tentative views held when the judgment of the trial court entered on special issue fact findings has been affirmed by the court of civil appeals. We are unable to agree with the majority on full and final consideration of the record before us, that the tentative view entertained in granting the writ, was correct.

About the time the two blasts of the whistle sounded Mr. Burden was crossing over the railway tracks toward his store in a northwesterly direction. Two witnesses testified that at the time they heard the "two toots" of the whistle they heard a sound like a train about to couple up. If Mr. Burden interpreted this noise as the witnesses did (and the jury had the right to infer that he did), then he had reason to believe that the train was about to be coupled with him in the dangerous situation above referred to. Just at this time the brakeman "hollered" to Burden to warn him of approaching danger, but there is evidence that the position of the brakeman when he called to Burden was such as to divert Mr. Burden's attention *away* from the approaching passenger train. It could well have been that he obeyed the warning as he understood it and that the "hollering" of the brakeman whom he had not then seen, and his "motionings" after he did see him, diverted his attention *away* from the direction of the oncoming train, with the result above stated. An ordinarily prudent person believing he was in danger of being caught between cars would have attempted to extricate himself. The jury had a right to believe that is what Mr. Burden did and the verdict indicates that the jury so believed.

With respect to Patton's statement that Mr. Burden said that "25" is coming, I believe I'll be going, there is neither any direct evidence that he did not say it nor any evidence corroborating that he did say it. Whether this testimony if believed, would establish that deceased knew the passenger train was approaching when he left the immigrant car door, need not be decided; nor whether the witness was a disinterested witness. Waiving aside both of these matters it still remains that there is considerable contradiction in the testimony of Patton on cross examination. These contradictions were such as to create

a doubt in the minds of jurors as to his credibility, which was for the jury (who heard and saw him as he testified.) It was for the jury to weigh his testimony and they were not required to accept it as true. The verdict indicates that the jury did not so accept it. Under these circumstances his evidence cannot be relied upon as establishing (contrary to the jury findings and the trial court's judgment and its affirmance by the court of civil appeals) that contributory negligence on the part of deceased was established as a matter of law; or that none of respondent's acts of negligence proximately caused Mr. Burden's death. Certainly such conclusions were not established so conclusively *that reasonable minds could not differ with respect thereto.*

Nor can we agree with the majority that the following statement in their opinion is the law of this State:

"Where one who uses a railroad crossing exercises no care whatever for his own safety, he is guilty of contributory negligence as a matter of law. In such cases a recovery is *always* denied *unless there is evidence in the record to support a recovery upon the doctrine of discovered peril.*" (Italics ours).

See the addendum of the Supreme Court in Trochta v. Missouri, K. & T. Co. (Com. App.), 218 S. W. 1038; also 7 T. L. R., pp. 128-40 (article entitled "Conclusive Evidence of Negligence in Crossing Accidents") loc. cit. pp. 128-9; also International & G. N. v. Edwards, 100 Texas 22, 92 S. W. 106 (in which the Supreme Court pointed out that the case was *"easily distinguished* from those in which this Court has held that, *under the facts thereof,* it would have been *improper* for the courts to have *instructed* that it was the duty of travelers to do any particular thing, such as to look and listen, *it being the function of the jury* to say what precautions were called for *by the particular situation";* see also Barron v. Houston, E. & W. T. Ry. Co. (Com. App., Sec. B), 249 S. W. 825 (showing reversal by Section B by majority opinion of its former view of contributory negligence as a matter of law,—conforming to the view that both the Edwards case and Galveston, H. & S. A. Ry. Co. v. Price (Com. App.), 240 S. W. 524 (cited by petitioner) both announced sound law as applied to the facts of the respective cases. See also Hines v. Arrant (Wr. Ref.), 225 S. W. 767, loc. cit. (1-3) pp. 768-9; and in this connection, Texas & Pac. Ry. Co. v. Day, 145 Texas 277, 197 S. W. (2d) 332, a case in which the question of Day's negligence was held to be for the jury. This is the only opinion of the Supreme Court which has cited the familiar

Section B crossing case, Gulf, C. & S. F. Ry. Co. v. Gaddis (Sec. B, Com. App.), 208 S. W. 895, (cited by the majority but not by petitioner) in the well nigh 30 years since it was written. It was correctly decided and the Supreme Court approved the "judgment recommended" by that Section on the ground that under its particular facts "contributory negligence as a matter of law" was shown. It has no controlling kinship to the present case and is not in point in that there was no testimony tending to show that Gaddis' attention was diverted away from the train that struck him.

The Gaddis case was not cited by the Supreme Court as authority upholding a conclusion that Day was negligent as a matter of law, but was cited along with the Edwards case in explanation (without distinguishing discussion) of the unequivocal holding that Day's negligence was not conclusively established. See the statement in the Day case immediately following the citation, and the apt quotation in that connection from the Hines case.

For the reasons above indicated we respectfully enter our dissent to the opinion of the majority.

Opinion delivered June 25, 1947.

Chief Justice Alexander and Associates Sharp and Simpson, concurring.