**J. B. McBETH, Individually and as Next Friend of Roger McBeth, Appellant,**

**v.**

**The TEXAS & PACIFIC RAILWAY COMPANY, Appellee.**

No. 16796.

Court of Civil Appeals of Texas.

Fort Worth.

March 24, 1967.

Rehearing Denied April 21, 1967.

Abney & Burleson, and Fred S. Abney, Dallas, for appellant.

Brown, Herman, Scott, Young & Dean, and Ardell M. Young, Fort Worth, for appellee.

OPINION

LANGDON, Justice.

Summary judgment case.

Appellant, J. B. McBeth, individually and as Next Friend of his minor son, Roger Mc-

Beth, seeks to recover a monetary judgment against appellee, The Texas & Pacific Railway Company, for injuries and damages arising out of an automobile-train collision which occurred at a grade crossing on Southwest 23rd Street in Grand Prairie, Texas, on the morning of January 14, 1964. Appellee's motion for summary judgment was granted.

The record before this Court reveals the following undisputed facts:

Roger McBeth, born in Longview, Texas, on April 10, 1946 moved to Grand Prairie, Texas, in April of 1953. He was still residing there on January 14, 1964, a period of almost eleven years. On September 17, 1963, he enrolled at Arlington State College. Thereafter, he attended classes five days a week beginning at 8:00 o'clock A.M. on each of those days. He continued this schedule until January 14, 1964.

The cold and clear morning of January 14, 1964 with unlimited visibility found Roger McBeth driving west in a 1963 Chevrolet automobile on West Main Street (U.S. 80) headed toward the intersection of Southwest 23rd Street and its grade crossing in the City of Grand Prairie, Texas. As he passed a Shamrock Service Station at 2034 West Main Street, he sounded the horn of his automobile and waved to John Blythe, the service station manager. Shortly after McBeth passed the station, John Blythe saw a train going west on the tracks south of the station.

The west bound train, which John Blythe observed passing his station, was appellee's passenger train No. 3. It consisted of two diesel units followed by five cars. It was traveling on the northern set of two sets of parallel tracks. These tracks are situated between two heavily traveled thoroughfares, West Main Street (U.S. 80) on the north and West Jefferson Boulevard on the south and are not obstructed from view of motorists traveling east on West Main Street for at least one-half mile east of Southwest 23rd Street. These two thoroughfares and

tracks are crossed by Southwest 23rd Street, a street running north and south.

On the morning in question at the place where West Main Street (U.S. 80) crosses Southwest 23rd Street, the intersection was uncontrolled in that there were no traffic control signals. Thus, automobiles approaching the intersection from the east and desiring to turn left on Southwest 23rd Street had to cross two lanes of oncoming traffic. From the south curb line of West Main Street (U.S. 80) at this intersection to the first rail of appellee's tracks was a distance of 59 to 60 feet, and from the center of West Main Street to the nearest rail was more than 100 feet.

At the crossing itself, appellee had erected or caused to be erected various signs and electrical and mechanical signaling devices. These signs and signaling devices were unobstructed. Appellee had maintained electrical or mechanical signaling devices at this crossing for a period of ten years prior to January 14, 1964. On both the northwest and southeast corners of the crossing, appellee had erected a pole which had attached to it a standard railroad crossing sign reading, "Railroad Crossing." On each pole just below that sign was another sign which read "Two Tracks" and just below that was an electric sign which also read "Two Tracks." The pole on the northwest corner had a similar electric sign on its south side. Extending out from each pole just below the non-electrical sign reading "Two Tracks," was an arm from which hung four heads or lights, two on each pole facing north and south, respectively, on Southwest 23rd Street. These lights, which were colored bright red were operated by an electric current which activated said lights, when, as here, a west bound train reached a point 2,474 feet east of the crossing. The signal lights continued to operate until the train had cleared the crossing. While in operation the lights of each pair alternately blinked off and on. Also, on each pole below the preceding named signs was a reflectorized sign reading, "Stop on Red Sig-

nal." In addition to the two poles and their respective signs and lights, there were also four additional reflectorized signs positioned on the northwest, northeast, southeast and southwest sides of the crossing. These signs were setting at an angle so they faced northeast, northwest, southwest and southeast respectively. Each of these signs was approximately three feet in length and two feet in width and read, "Danger—Two Tracks—Watch for Train on Each Track."

The crossing and the tracks approaching straight from the east were unobstructed by any permanent object for at least one-half mile.

At the same time the train and Roger McBeth were approaching from the east, Andrew J. Renaker, Jr., driving a 1963 Ford pickup, was about to cross the tracks on Southwest 23rd Street proceeding north with the intention of turning right on West Main Street (U.S. 80). Just before Renaker made his way across the tracks, he observed the red signal lights on the warning device come on and begin blinking. These signals were initiated when appellee's train approaching from the east was 2,474 feet from the crossing. Looking to the east, Renaker saw the train coming with two headlights burning and heard its whistle blowing. The fact of whether the train's whistle sounded or not may be in dispute as John Blythe, the Shamrock Service Station Manager, said "I did not hear the train blow its whistle." Renaker crossed the tracks and stopped behind another automobile at the intersection which was waiting for the traffic to clear on West Main Street.

Generally speaking, the traffic that morning was the normal heavy morning traffic. The speed limit on West Main Street (U.S. 80) for traffic on the east side of Southwest 23rd Street was 40 miles per hour; and, on the west side, 45 miles per hour.

After waiting, Renaker observed the car in front of him move out and turn left. As Renaker started to roll forward, he saw a Chevrolet coming west on West Main Street. It made a left turn in front of him and proceeded south on Southwest 23rd Street toward the tracks, never making a stop or slowing its speed. Renaker estimated the speed of the automobile to be between 20 and 25 miles per hour. When the Chevrolet had moved alongside of him, Renaker noticed that it was occupied by one person, a white male, later identified as Roger McBeth. Renaker also observed that the red lights on the warning device were still blinking and heard the train still blowing its whistle as it approached the crossing. As Roger McBeth's Chevrolet moved past Renaker's pickup, R. H. Rodgers, the engineer of appellee's train, which was then some 80 feet east of the crossing and approaching at a speed of 55 miles per hour, observed the Chevrolet for the first time. The instant the engineer saw the Chevrolet driven by McBeth he threw the emergency brake, placed the entire train in emergency stop and continued to sound the whistle. Renaker never did see Roger McBeth look to the east or west before attempting to cross the tracks. As the Chevrolet attempted to cross the tracks, Charles S. Johnson, a student at Arlington State College, who was driving on West Jefferson Street on his way to school, saw Roger McBeth's automobile for the first time. Just prior to this time Johnson had observed the train moving to his right, heard its whistle blowing and saw the signal lights at the Southwest 23rd Street crossing flashing a color he could not identify because he is red and green color blind. Appellee's train struck the McBeth automobile in the left side toward the back. Johnson and appellee's engineer Rodgers both noted that Roger McBeth never varied the speed of his automobile one bit from the time they first observed him until the collision. The record is totally void of any evidence intimating that Roger McBeth was ever aware of any automobile traffic, warning signs, signals or appellee's train before the collision. The force of the collision hurled his automobile in a southwesterly direction for a considerable distance and

Roger McBeth was thrown onto the road bed.

■ The purpose of the summary judgment procedure as provided for in Rule 166-A, Texas Rules of Civil Procedure, is the "elimination of patently unmeritorious claims or untenable defenses." Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, 931 (1952).

■ However, the Rule must be cautiously applied because it was never intended to be used as a tool "to deprive litigants of their right to a full hearing on the merits of any real issue of fact." Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, 931 (1952), quoting with approval from Kaufman v. Blackman, 239 S.W.2d 422, 428 (Dallas Civ. App., 1951, writ ref., n. r. e.). But when a proper case arises as is contemplated by the Rule, its application will facilitate the expeditious administration of justice. We have concluded that this is such a case.

Article 6701d, Section 86, V.A.C.S., provides in part as follows:

"Sec. 86. Whenever any person driving a vehicle approaches a railroad grade crossing, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad and shall not proceed until he can do so safely when:

(a) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a train; * * *

(d) An approaching train is plainly visible and is in hazardous proximity to such crossing."

The Supreme Court of Texas in construing Article 6701d, Section 86(d) has declared that the duty of a motorist to stop within fifty (50) but not less than fifteen (15) feet of the nearest rail of a crossing is not absolute, but is conditioned upon the existence of certain conditions. Missouri-Kansas-Texas Railroad Company v. McFerrin, 156 Tex. 69, 291 S.W.2d 931, 935 (1956). This would necessarily be true of the other subdivisions under Section 86. The Court further held that when these conditions were conclusively established, the duty to stop became absolute, and thus a directed verdict, or as here a summary judgment, would be proper.

The conditions creating a duty upon a motorist approaching a railroad crossing to stop in compliance with Subdivision (a) are as follows: (1) An electrical or mechanical signaling device is at the crossing; (2) A signaling device is "plainly visible"; (3) A signaling device is giving warning of the immediate approach of a train; and (4) A train is approaching.

With respect to Subdivision (d) the conditions are as follows: (1) A train is approaching the crossing; (2) The train is "plainly visible"; and (3) The train is in "hazardous proximity" to the crossing.

The undisputed facts in this case establish conclusively that the conditions above recited existed on the morning of the collision and created an absolute duty on the part of Roger McBeth to stop within the statutory distance of the nearest rail of the crossing. Under the facts, it cannot be seriously contended that Roger McBeth was not familiar with these tracks, their respective location to the street upon which he was traveling and that these tracks were used regularly by railway traffic.

■ A person who has knowledge of a railroad crossing is charged with knowledge of existing danger from trains which may be moving thereon. Texas & N. O. R. Co. v. Burden, 146 Tex. 109, 203 S.W.2d 522, 529 (1947); Gulf C. & S. F. Ry. Co. v. Gaddis, 208 S.W. 895, 896 (Tex.Comm. App., 1919); Wichita Falls & Southern R. Co. v. Anderson, 144 S.W.2d 441, 443–444 (Eastland Civ.App., 1940, dismissed, judg. correct); Higginbotham v. International-Great Northern R. Co., 99 S.W.2d 338, 340 (Amarillo Civ.App., 1936, dismissed); San Antonio & A. P. Ry. Co. v. Singletary,

251 S.W. 325, 326 (San Antonio Civ.App., 1923, dismissed); 48 Tex.Jur.2d 342, "Railroads", § 321. The Supreme Court of Texas in Texas & N. O. R. Co. v. Burden, 146 Tex. 109, 203 S.W.2d 522, 529 supra, quoting with approval from the Commission of Appeals opinion in Gulf C. & S. F. Ry. Co. v. Gaddis, 208 S.W. 895 supra stated:

"All men in possession of their faculties are charged with knowledge that a railroad track is a dangerous place, and the law will not permit them to go upon the track, even at a public highway, without being charged with a recognition of the danger attending such action and the use of such care as ordinary prudence would dictate in so doing."

In Higginbotham v. International-Great Northern R. Co., 99 S.W.2d 338 supra, the Amarillo Court quoting with approval from the San Antonio Court's opinion in San Antonio & A. P. Ry. Co. v. Singletary, 251 S.W. 325, 326 supra, stated:

"A railroad track is of itself a proclamation of danger, imposing upon the traveler at the railroad crossing a positive duty of using care to avoid trains." To the same effect see also Wichita Falls & Southern R. Co. v. Anderson, 144 S.W.2d 441, 443 supra. Thus, in preparing to make his turn and in making his turn, Roger McBeth was charged with knowledge of the existing danger at the Southwest 23rd Street crossing from trains which might be traveling thereon.

■ Further, it is established law that a person who intends to cross a railroad crossing has the duty of exercising ordinary care and diligence to ascertain whether a train is approaching. Galveston, H. & S. A. R. Co. v. Wells, 121 Tex. 310, 50 S.W. .2d 247 (1932); 48 Tex.Jur.2d 325–326, "Railroads", § 317.

Before Roger McBeth reached the intersection to make his turn, he could have observed that the crossing over which he must subsequently pass had signal lights and signs posted. These signals were in operation, blinking off and on, before he ever reached the Southwest 23rd Street intersection. As Roger McBeth approached the intersection he was confronted by appellee's three foot by two foot sign reading "Danger—Two Tracks—Watch for Train on Each Track." This sign was positioned at an angle on the southwest corner of the intersection in order that traffic approaching this intersection from the east with the intention to turn and proceed across this crossing would be warned of the number of tracks and of railway traffic which might be moving thereon. It is conceded that the signal lights were unobstructed and observable to one reaching the intersection. The distance from the center of the intersection to the nearest rail of appellee's tracks was more than 100 feet. Thus Roger McBeth had at least 100 feet of opportunity to observe these flashing lights and signs before reaching the tracks. These lights continued to operate at all times up to the collision and were never obstructed at any point. Prior to, during, and after Roger McBeth's turn, the numerous signs, both painted and electric, gave warning of railway traffic moving on the tracks. Also, from the center of the intersection Roger McBeth had an unobstructed view for several hundred feet of the tracks approaching straight from the east. As he approached the tracks from the center of the intersection, the slightest turn of his head to the left or the slightest glance to the left would have revealed appellee's approaching train which consisted of seven units. Due to the relative speed of the train and Roger McBeth's automobile, respectively, the fact of the collision establishes that the train was within "hazardous proximity" of the crossing and "plainly visible" to him during the time of Roger McBeth's turn at the intersection and at all times thereafter.

The Supreme Court in Missouri-Kansas-Texas Railroad Co. v. McFerrin, 156 Tex.

69, 291 S.W.2d 931 (1956) P. 940, wrote as follows:

"There is in the record expert testimony from a surveyor which clearly tends to establish that after the deceased made his turn toward the track and at all times after he came within fifty feet thereof he could have seen the train if he had looked to his right. Ordinary care for his own safety required that he look to his right before passing through the stopping zone. We therefore hold, as a matter of law, that the train was 'plainly visible' when the deceased entered, or at least while he was within the statutory stopping area."

Prior to the preceding quoted matter, the Court held:

" * * * before it can be said in a given case that an approaching train was 'plainly visible' as a matter of law, it must appear, as a matter of law, that a reasonably prudent person, situated as was the motorist and exercising ordinary care for his own safety, should have seen it." 291 S.W.2d 936.

With respect to whether the train was within "hazardous proximity" of the crossing, the Court considered the relative speeds of the train and automobile along with the other circumstances and wrote as follows:

"We hold, as a matter of law, under the facts and circumstances of this case, that a reasonably prudent person, situated as was the deceased, should have known that an attempt to proceed over the crossing ahead of the train, was hazardous. We accordingly hold, as a matter of law, that at the time the train became 'plainly visible' it was 'in hazardous proximity' to the crossing." 291 S.W.2d 940.

In considering the facts of this case in light of the law pronounced in the McFerrin case, supra we find and hold that Roger McBeth on the occasion in question was under a duty to stop. His failure to do so constituted negligence per se. Such

negligence as a matter of law was a proximate cause of the collision in question.

The collision would not have occurred had Roger McBeth stopped his car in compliance with the duty imposed upon him under the conditions prescribed by the statute.

We further find and hold that Roger McBeth was guilty of common law negligence because of (1) his failure to keep such a lookout for his own safety as a person of ordinary prudence in the exercise of ordinary care would have kept under the same or similar circumstance; (2) his failure to stop before going upon the tracks, and (3) in driving his car onto the crossing when the train was in full view, and that such acts and conduct in each instance was a proximate cause of the collision.

It follows from what we have said that in our opinion the evidence showed conclusively that McBeth was not acting under a sudden emergency. Any emergency under which he acted was created by his own negligence.

The appellant is therefore precluded from obtaining any recovery. Texas & New Orleans Railroad Co. v. Day, 159 Tex. 101, 316 S.W.2d 402 (1958).

We are of the opinion that the evidence did not raise issues of fact as to whether (1) Roger McBeth was in a situation where it was impossible for him to comply with the statute and (2) that he was in that situation as a result of no negligence on his part. Hammer v. Dallas Transit Co. 400 S.W.2d 885, 887 (Tex.1966.)

In Southern Pacific Company v. Matthews, 335 F.2d 924, 927 (5th Cir., 1964, cert. den. 379 U.S. 970, 85 S.Ct. 668, 13 L. Ed.2d 562), a case involving a collision between a train and an automobile, testimony in the record showed that from 20 feet of the nearest rail a person could see for a distance of 225 feet down the track and a panoramic photograph in evidence showed that at a distance of 50 feet from the crossing there was a clear view of the track for at least

250 feet. The driver of the automobile said he was looking for a train and that he did not see it until he was on the tracks. The Court stated:

"* * * Considering only the testimony of the appellees and their witnesses, and the undisputed proof as to the physical layout, the inescapable conclusion is that had L. D. Matthews looked, as the law required, he would have seen the approaching train in time to have stopped before reaching the tracks." 335 F.2d 926.

The opinion continued:

"* * * In any event, at twenty feet from the track the photograph demonstrates what is clear from the testimony of Parker, that at this distance the appellees had a clear view of that portion of the tracks on which the train was traveling. Testimony which is at variance with physical facts is no evidence. * * *" 335 F.2d 927.

The Court held, as a matter of law, that the railroad was entitled to judgment in that there was no proper issue of fact for the jury to decide.

■ The appellant contends that McBeth could neither have seen the train nor have observed the signals flashing prior to the time he reached the intersection to commence his turn. This it was argued was because it was essential that he give his undivided attention to finding an opening in the traffic. Then to drive his automobile safely across the two lanes of early morning rush hour traffic at such a speed (20–25 miles) that when he had passed safely across this traffic, it was impossible for him to avoid collision with the train. This argument presumes tht McBeth could not make any effort to stop his car until its rear end had cleared the edge of the street he was leaving and that his reaction time would not permit him to stop. It also presumes that oncoming traffic he was crossing in front of was bearing down on him and was so near that he was not required to look at the road in front of him after he made the turn. We think this argument

is untenable. The appellant appears to stress McBeth's inability to see the train when he made his turn rather than his inability to see the flashing signals and other signs. It is apparent that had he looked in the direction he was going he would have seen the flashing signal. This signal warned of the movement of something on the tracks. It is like a knock on the door or the ringing of the doorbell. While you may not know the identity of the one initiating the signal you are on notice that someone is at the door. In this case there is nothing to explain the failure to see the signal or thereafter to prevent McBeth from turning his head or eyes to either direction to determine what was on the track.

The appellant's argument could be interpreted to indicate that McBeth was negligent in making the turn at the intersection when he did because of the nearness of oncoming traffic when he knew before making the turn that he must cross the railroad tracks and perhaps be required to stop.

Appellant introduced the affidavits of appellant J. B. McBeth and M. C. McLain, an attorney of record in this case for appellant. Neither of these gentlemen witnessed the accident. Attached to J. B. McBeth's second affidavit were certain photographs allegedly representing the scene of the accident on January 14, 1964, and at various times thereafter, certain photographs allegedly representing the scene as it unfolded before Roger McBeth on the day of the collision, and a photograph of Roger McBeth's automobile after the collision. Attached to Attorney M. C. McLain's affidavit were three exhibits, two of which he said were published by the National Safety Council and are entitled "Stopping Distances" and "Brake Analysis", respectively, and the third exhibit consists of excerpts from some printed matter he claimed was published by the American Railway Engineering Association entitled "Signals for Highway-Railway Grade Crossing".

The affidavits contain many statements which would be inadmissible as evidence.

They contain opinions and conclusions. They presume matters which find no support in the record. The documentary exhibits attached to the McLain affidavit are not properly identified, and no predicate is made or established for their being received into evidence.

The Supreme Court in Gaines v. Hamman, 163 Tex. 618, 358 S.W.2d 557, 562 (1962), wrote:

" * * * this Court in Tobin v. Garcia, 159 Tex. 58, 316 S.W.2d 396 * * * said that under the provisions of Rule 166–A affidavits to be effective either to support or oppose a motion for summary judgment 'must be made by competent affiants with the personal knowledge of the statements in them, which statements must be so worded that if given on the witness stand they would be admissible as evidence.' Obviously mere conclusions will not suffice * * *."

■ Since neither J. B. McBeth nor McLain, the affiants, witnessed the accident then neither could have known the exact conditions which existed at the time of the accident. Their affidavits are fraught with opinions and conclusions based upon conjecture and speculation. Attorney McLain attempted to conduct an experiment by his affidavit without showing that the experiment was made under the same or similar conditions as existed at the time of the accident. Appellant places great weight and reliance upon the three exhibits that are attached to McLain's affidavit. Said exhibits are referred to in the affidavit as "Stopping Distances" of the National Safety Council and a portion of Chapter 9 of the Manual of the American Railway Engineering Association. These exhibits are clearly hearsay. They are ex parte instruments. There is no evidence in the record that said exhibits are applicable in any way to the established conditions which existed at the scene of the accident involved in this case.

In Thedorf v. Lipsey, 7th Cir., 237 F.2d 190 (1956), the Appellant contended that the trial court erred in refusing to admit into evidence the "Manual of the Motor Vehicle Department of Wisconsin" pertaining to stopping distances under various circumstances. The Court of Appeals held that it was proper to exclude said Manual and said: "The manual which plaintiff sought to introduce purported to have been issued by the State and contained certain statistics bearing upon stopping distances under various circumstances. It sought to inform motorists of normal expectations in traffic under normal conditions. It was not endowed with the characteristics of a statute; it was not legislative action, but had been issued, apparently, by the Department to supply information and suggestions to the travelling public. It could have had no probative effect upon the question of negligence on the part of defendant. If it was intended by plaintiff's offer to supply the jury with evidence as to what was a safe stopping distance for defendant after he discovered plaintiff and the motorcycle at the time of the accident, it was incompetent for the reason that the opinions, conclusions and statistics included in it were unsworn statements made by parties outside the presence of the court, who were not submitted as witnesses and who could not be cross-examined. It comprised merely ex parte statements of third persons, incompetent for any purpose in the trial of the cause." 237 F.2d 192.

■ Appellant contends that the photographs attached to J. B. McBeth's second affidavit show all that Roger McBeth could have seen as he approached the intersection and came upon the crossing immediately prior to the accident. We disagree. No camera has a lens wide enough to include what a person with good vision can see. Such persons are able to see to the side as well as straight ahead. This is called peripheral vision. The camera used in taking the questioned photographs was not equipped to pick up and portray the side or peripheral areas. Roger McBeth's peripheral vision would have permitted him to see far more as he approached the crossing

than is shown by the photographs. The photographs make no allowance for any movements Roger McBeth may or could have made by turning either his eyes or his head to the right or left just prior to the accident. Higginbotham v. Bagley, 346 S.W.2d 142 (Beaumont Civ.App., 1961, writ dism.).

The undisputed facts properly before the court conclusively showed that there was no issue of gross negligence on the part of the appellee and that neither appellee nor its employees acted with heedless and reckless disregard of the rights of Roger McBeth.

On the other hand we think that such facts conclusively show that the conduct of Roger McBeth on the occasion in question constituted statutory and common law negligence proximately causing the collision and the resulting injuries to his person and damages to the car he was driving. All points of error are overruled and the judgment of the trial court is affirmed.