**TEXAS & N. O. R. CO.**

v.

**LANDRUM et al.**

No. 4932.

Court of Civil Appeals of Texas.

Beaumont.

Jan. 14, 1954.

Rehearing Denied Feb. 4, 1954.

Woodul, Arterbury & Wren, Baker, Botts, Andrews & Parish, Houston, for appellant.

Hill, Brown, Kronzer & Abraham, Houston, Campbell & Foreman, Livingston, for appellees.

ANDERSON, Justice.

At 11:07 A.M., on January 11, 1952, while she was either walking across appellant's railroad track or along it between the rails, in the business district of Livingston, Texas, Mrs. Jeanette Landrum was struck by the engine of one of appellant's regularly scheduled, northbound passenger trains. The injuries which were thereby inflicted upon her resulted in her death on January 21, 1952.

Appellees, T. E. Landrum, Lucille Landrum and Avis Leon Landrum, and George L. Henderson, who are Mrs. Landrum's surviving husband, minor children, and father respectively, sued appellant, Texas and New Orleans Railroad Company, to recover damages alleged to have been sustained by them as a result of her death. The expense incurred for medical, hospital and nursing care accorded Mrs. Landrum as a result of her injuries, as well as that incident to her burial, was included in the damages T. E. Landrum sought to recover. Upon the trial, the defendant's motion for an instructed verdict having been first denied, and the

plaintiff having waived any right they may have had to have issues pertaining to alleged acts of primary negligence on the part of the defendant submitted, the case was submitted to the jury solely upon issues under the doctrine of discovered peril and upon the damage issues. Based on the jury's verdict, judgment was rendered against appellant railroad company for a total sum of $36,169.30, apportioned as follows: T. E. Landrum, $3,669.30; Lucille and Avis Leon Landrum $16,000 each; George L. Henderson, $500. All except $1,500 of the amount adjudged to T. E. Landrum represented expense incurred by him as a result of his wife's injuries and death.

The appellant has brought forward six points of alleged error. In its first point it urges that there was no evidence to justify submission to the jury of the issues under the doctrine of discovered peril and that a verdict for the defendant should have been instructed. In its second point it urges that the award of damages in the amount of $32,000 to the two children, Lucille and Avis Leon Landrum, was grossly excessive and should be set aside. In its third and fourth points it complains of the admission of certain evidence: The engineer on the train which struck Mrs. Landrum was permitted to testify, in effect, that sharp blasts of the engine's whistle were effective to attract the attention of people; that such blasts had been resorted to upon other occasions to get people off the track in Livingston; and that he might have attracted Mrs. Landrum's attention with the whistle and enabled her to get out of the way before she was struck if she had approached the track on his side and he had seen her. In its fifth point appellant complains of the submission to the jury of special issue No. 8, in its sixth point it complains of the failure of the trial court to set aside and disregard the jury's answer to such issue, urging that there was not sufficient competent evidence to justify submission of the issue or to support the jury's answer thereto. Special Issue No. 8 pertained to the expense incident to Mrs. Landrum's burial.

In passing upon whether or not there was sufficient evidence to require that the issues under the doctrine of discovered peril be submitted to the jury, and to support the jury's answers to those issues, we must bear in mind that it was the province of the jury to judge the credibility of the witnesses and the weight to be given their testimony, and to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses. Ford v. Panhandle & Santa Fe Ry. Co., Tex., 252 S.W.2d 561. In discussing the question, therefore, we shall concern ourselves primarily with the evidence which tends to support the jury's verdict.

According to his own testimony the fireman on appellant's locomotive saw Mrs. Landrum and realized she was in a position of peril when she was within three or four feet of the track, and when the front end of the locomotive was at or had almost arrived at the north edge of Church Street. The north edge of Church Street was 103 feet south of where Mrs. Landrum stepped onto the track, and, under what appears to be appellant's theory of the case, it was 111 feet south of where she was when the locomotive struck her. Mrs. Landrum approached the west side of the track, along a footpath that traversed a vacant lot between two buildings. The evidence indicates that as she approached, she was walking at no more than a normal gait, and perhaps at only a leisurely gait. She was walking in a northeasterly direction, with her back almost toward the approaching train. The appellant introduced evidence to show that upon stepping onto the track Mrs. Landrum turned and, with her back toward the train, walked along the track, reading a letter she held in her hands, for a distance of six or eight feet before she was struck. There was no evidence tending to show that she was ever aware of the approach of the train until the locomotive struck her. The evidence, in fact, tended to show the contrary.

The locomotive engineer did not see Mrs. Landrum until after she had been struck and the train had been stopped. Their rela-

tive positions were such that he could not see her beforehand. When the train had been stopped, Mrs. Landrum was found lying almost directly beneath the cab of the locomotive.

The speed of the train at the time the fireman first discovered Mrs. Landrum was variously estimated by the fireman, the engineer, and the conductor at from 10 to 18 miles per hour. The conductor, who professed not to have been paying much attention to it, first estimated the train's speed at 10 miles per hour, and then at from 10 to 15 miles per hour. He said the train was running very slowly. The engineer's estimate was that the train was traveling at the rate of from 15 to 18 miles per hour.

The fireman testified that immediately upon seeing Mrs. Landrum he hollered to the engineer to "hold it," which was his way of calling for an emergency application of the brakes. An emergency application of the brakes was made, and the train was brought to a stop when the front end of the locomotive was approximately 200 feet north of the north edge of Church Street, or approximately 90 feet north of where Mrs. Landrum was when she was struck. Both the engineer and the fireman testified that the brakes were applied immediately after the signal to stop was given. The engineer expressed the opinion that he made a good stop, and other evidence was introduced by appellant to show that the train had been stopped as quickly as it well could have been; more quickly, in fact, than was to have been expected. Both the fireman and the engineer expressed the opinion that when traveling no faster than it was upon the occasion in question, the train they were operating could be stopped within a distance of 100 feet after the fireman signalled for a stop. At a later stage of his testimony the engineer testified that his opinion was based on what he conceived to be the distance within which he did actually stop the train upon the particular occasion. He said it seemed to him that he stopped within a distance of 10 feet after receiving the signal to stop.

The fireman did not call for the whistle to be blown and it was not blown after Mrs. Landrum's position of peril was discovered. The bell on the locomotive was ringing, however, and had been ringing continuously since the train entered the city limits of Livingston, and the bell on the wig-wag signal at Church Street was ringing. There was also evidence to show that in process of stopping after the emergency application of its brakes had been made, the train itself made unusual and very pronounced noises. And in addition one of appellant's witnesses, L. D. Simpson, testified that in an unsuccessful effort to apprise Mrs. Landrum of the train's approach he hollered loudly at her just before the locomotive struck her.

The effectiveness of the possible warnings to Mrs. Landrum which have just been mentioned was challenged by other evidence and by the attending circumstances. The engineer testified that the locomotive's bell is a "not too effective" warning device. "You have got to listen for it," he said. He also testified that the bell at the Church Street crossing was not loud and was designed primarily as a warning only to people at the crossing. The commotion incident to stoppage of the train followed the effective and full application of the brakes, and, under appellant's own theory of the case, if the brakes ever fully took hold before the locomotive struck Mrs. Landrum they did so only momentarily before. Evidence to impeach the witness Simpson in some phases of his testimony was introduced by appellees, but even if his testimony is accepted as true, it once again appears that his warning was given only momentarily before the locomotive struck Mrs. Landrum.

The fireman testified that since the whistle had been blown just shortly before he discovered Mrs. Landrum, he concluded it would be useless to blow it again, whereas the brakes might either stop the train or else slow it enough to permit Mrs. Landrum to get out of its path before it overtook her. His testimony is susceptible of the construction, and may even require it, that he consciously and deliberately rejected the

thought of calling for the whistle to be blown.

The standard crossing signal (a long blast, two short blasts, and another long blast) had been sounded with the whistle at least three times, and possibly four, for street crossings within some four blocks of where Mrs. Landrum stepped onto the track. The last of these signals had been sounded for the Church Street crossing or for the crossing of Jackson and Church Streets, just south of where the tragedy occurred. Due to the fact that the railroad passes almost through the intersection of Jackson and Church Streets, the crossings of those streets are treated as one crossing insofar as signalling is concerned, or so the fireman testified.

Appellant's railroad makes a sweeping curve through the business district of Livingston. Between the west margin of Jackson Street (a street that runs north and south) and the north margin of Church Street (a street that runs east and west) it lies within Jackson Street and across Church Street for a distance of 230 feet. The east rail of the track (which is on the outside of the curve) passes virtually through the intersection of the south margin of Church Street and the east margin of Jackson Street. The railroad lies between buildings southwest of its intersection with Jackson Street, and buildings stand on the west side of Jackson Street north of the intersection. A small building also stands just west of the railroad and north of Church Street. This latter building was between Mrs. Landrum and the train until Mrs. Landrum was within a comparatively few feet of the track.

The fireman testified that in giving crossing signals the whistle is customarily blown until the locomotive reaches the road or street crossing, and that at times the whistling is continued until the crossing has been entered upon. He estimated that on the day Mrs. Landrum was injured the locomotive had entered upon the west side of Jackson Street for a distance of about 15 feet when the last blast of the whistle for the Jackson and Church Street crossing ter-

minated. The engineer estimated that the locomotive was about to enter the south side of Church Street when the last blast terminated. Other witnesses were of the opinion the whistle was still blowing after the locomotive had crossed Church Street. It was, as already stated, the province of the jury to resolve these conflicts; and assuming, as we feel obligated to do, that the jury accepted the fireman's version of where the whistling ended, the locomotive was then approximately 326 feet from the point at which it overtook Mrs. Landrum.

If we assume that the train was traveling at the highest rate of speed at which any of the witnesses estimated it to have been traveling (18 miles per hour), it was traveling only 26.4 feet per second. The jury may reasonably have concluded, therefore, that some twelve seconds elapsed between the time the last whistle blast sounded and the time at which the locomotive struck Mrs. Landrum, and that some eight seconds elapsed between the time the last whistle blast sounded and the time at which the fireman discovered and realized Mrs. Landrum's perilous position. If, as it may reasonably have done, the jury concluded that the train was traveling at a lesser rate of speed than 18 miles per hour, these time lapses would have been correspondingly greater. And, even though no allowance be made for an interim reduction in the speed of the train as a result of the application of the brakes, four seconds or more elapsed between the time Mrs. Landrum's perilous position was discovered by the fireman and the time at which the locomotive struck her.

The fireman testified not only that he could have called for the whistle to be blown instead of for the brakes to be applied, but that he could have called for both the whistle to be blown and the brakes to be applied, and that the engineer could have both blown the whistle and applied the brakes at the same time. Both he and the engineer testified that the whistle could have been blown almost instantaneously, and the fireman testified that Mrs. Landrum could have stopped before stepping into the path of the train if her attention had been

attracted to the train when he first saw her and realized her perilous position. The fireman also testified that, with due allowance for reaction time on the part of the various parties concerned, there was, in all probability, time enough after he discovered Mrs. Landrum's position of peril not only for the whistle to have been blown (had he called for it to be), but for both the whistle to have been blown and the brakes to have been applied, and for Mrs. Landrum—had the whistle been blown and had she responded to it—to have withdrawn or stepped aside from the path of the train before the locomotive struck her.

No contention was made that Mrs. Landrum had any physical impairments which rendered her incapable of hearing the train or its whistle, or of acting quickly to save herself if she had become aware of the train's approach. Neither was there any contention that she was under the influence of any drug, intoxicant or similar agency calculated to affect either her mental faculties, her reflexes, or her locomotion. The evidence was all to the contrary on both scores.

As recently as a few minutes before she was injured, Mrs. Landrum had been discharging her duties as a waitress in the White Kitchen Cafe. She was returning from the post office to the cafe when the train struck her. The post office stood west of the railroad, while the cafe was situated east of the railroad and approximately 100 feet north of where she stepped onto the track. The rear entrance to the cafe was within a few feet of the railroad.

Both the engineer and the fireman were long experienced in their jobs and in the operation of trains of the same kind as that which struck Mrs. Landrum. Both had participated in the operation of appellant's passenger trains over the same railroad for many years. The engineer, of necessity, had many times and in varying circumstances stopped similar trains, and the fireman had seen them stopped. Both, it may be reasonably inferred, were possessed of expert knowledge, gained from experience, which should have enabled them to judge with reasonable accuracy the distance within which the train, its speed considered, could be brought to a stop. Both, it may be also reasonably inferred, were well versed in the locomotive's warning devices, and had widely observed the reactions of people to those devices under varying conditions as regards distance, intervening objects, and variations in the method of sounding the devices.

The engineer testified, as already stated, that the locomotive's bell is a "not too effective" warning device. The whistle, according to his testimony, is the principal warning device which people have a chance to hear, and a "succession of sharp blasts" of the whistle will attract attention even when the ordinary crossing signals will not. He said that people who have become accustomed to trains and their normal whistle signals seem not to hear them at times, but that even they take note of a succession of sharp blasts, because the sharp blasts are unusual. These short, sharp blasts of the whistle "just never fail," according to his testimony, to attract attention, and because they are unusual and are best calculated to attract attention, they are resorted to for the purpose of warning people who are discovered to be in danger from the train. The engineer volunteered: "Of course, in this case if we had seen the woman in time and could have did that, might have done some good." There had been no occasion to sound a succession of sharp blasts of the whistle immediately before Mrs. Landrum's position of peril was discovered, and the whistle had not been blown in that manner at the Jackson and Church Street crossing.

The engineer admitted that he was familiar with the footpath along which Mrs. Landrum approached the railroad, and knew that in the vicinity of the scene of the accident pedestrians frequently walked both along the track between the rails and along the side of the track. He testified that upon previous occasions he had found it necessary to "blow people off the track" in Livingston.

It is readily apparent from the foregoing summary of the evidence that the question

for decision is whether or not there was sufficient evidence to support a finding by the jury that after the fireman discovered Mrs. Landrum's position of peril he and the engineer, or the one or the other of them, failed to exercise reasonable care in the use of the means at their command, consistent with their own safety and that of the train and its passengers, to avoid injuring her.

In disposing of the question we do not decide and shall forego discussing whether there was sufficient evidence to support a finding that in the circumstances the train could and should have been stopped, but we shall assume for present purposes that the train could not be stopped in time to avoid injury to Mrs. Landrum. The fact that the operatives of the train may have exercised reasonable care in the use of all means at their command in a futile effort to slow and stop the train does not, however, absolve appellant from liability under the doctrine of discovered peril. The question remains of whether the train operatives exercised reasonable care in the use of the means at their command, consistent with their own safety and that of the train and its passengers, to warn Mrs. Landrum so that she might have extricated herself from her position of peril before being injured. Texas & N. O. R. Co. v. Krasoff, 144 Tex. 436, 191 S.W.2d 1; Houston & T. C. R. Co. v. Stevenson, Tex.Com. App., 29 S.W.2d 995; Missouri, K. & T. R. Co. of Texas v. Reynolds, 103 Tex. 31, 122 S.W. 531. The applicable rule was stated and explained by Justice Brewster in the Krasoff case [144 Tex. 436, 191 S.W. 2d 3] in the following manner: "Use of means at his command by a train operative is not necessarily restricted to stopping or slowing the train to avoid striking the party in peril. It may include as well the giving of an alarm by bell or whistle so that the one in peril may have an opportunity to extricate himself. This principle is based on the fact that the injured party's peril may be discovered when it is too late to save him by stopping or slowing the train but the tragedy may be averted by giving a warning."

On the evidence which it had before it the jury may have reasonably concluded, we think, that if the whistle had been sounded with reasonable dispatch after Mrs. Landrum's perilous position was discovered and realized by the fireman and at the time when the train was bearing directly down upon her, and particularly if a succession of sharp blasts such as are used as distress warnings had been sounded, Mrs. Landrum in reasonable probability would have heard the whistle and been aroused to consciousness of the train's approach in time either to have refrained from getting in the train's path or to have gotten out of it before she was injured. The jury may have also reasonably concluded, we think, that in the circumstances the fireman reasonably should have foreseen and realized the impossibility or improbability of stopping the train before it should overtake Mrs. Landrum, or of slowing it sufficiently to avoid injuring her if she remained on the track, and that in failing to call for the whistle to be blown he failed to exercise reasonable care to use a means at his command to avert what followed.

The appellant argues that, taking into consideration the blowing of the whistle at the Jackson and Church Street crossing, the ringing of the bells, the noise of the train itself (particularly as it was stopping), and the fact that the witness Simpson hollered at Mrs. Landrum without attracting her attention, the evidence conclusively demonstrated that further blowing of the whistle would have been futile. These, however, were matters for the jury to weigh in the light of the time which had elased since the whistle had last sounded, of the fact that the train was on a curve and buildings had been between it and Mrs. Landrum when the whistle had been previously sounded, of the nature of the various noises and warnings mentioned, and of all the other facts and circumstances in evidence.

The appellant also argues that this case should be controlled by the decision of the Supreme Court and of the Court of Civil

Appeals on the second appeal in the case of Texas & N. O. R. Co. v. Grace, respectively reported in 144 Tex. 71, 188 S. W.2d 378, and in 204 S.W.2d 857, wherein the evidence was held insufficient to support recovery under the doctrine of discovered peril on a death claim. The cases, however, are easily distinguished on their facts. About the only similarity between the two fact situations, in truth, is that the accidents happened within a few feet of each other. In the Grace case the decedent was drunk and asleep on the track, unable to heed or to respond to the warnings that were given. The plaintiffs were contending, not that the whistle was not blown when it should have been, but that the fact that the whistle was blowing before the train reached the decedent, and continued to blow until it did reach him, was a sufficient circumstance to warrant a finding that the train crew discovered and realized the decedent's peril earlier than they admitted having done and in time to have stopped the train before it struck him. It was held that under the particular facts of the case the mentioned circumstance was not sufficient to support such a finding.

■ It follows from what has been said that we are of the opinion the evidence was sufficient to require submission of the issues under the doctrine of discovered peril and to support the jury's answers to those issues. Appellant's first point is accordingly overruled.

We have already stated that the testimony which is complained of in the appellant's third and fourth points was elicited from the engineer who was operating the train that struck Mrs. Landrum. It was elicited by plaintiffs' counsel in the course of the inquiry about the variety of whistle blasts and whistle signals or warnings employed by the engineer, their purposes and effectiveness. Particular inquiry was being made about the kind of blasts used as emergency or distress warnings to people in imminent danger from the train, and about the effectiveness of short, sharp, piercing blasts to attract attention.

The engineer testified that he used a succession of short, sharp blasts as a distress warning and to attract attention when ordinary warnings failed to do so. He explained and extolled their virtues for these purposes, but it is not necessary here to recount his testimony in this respect, for sufficient of it for present purposes has been hereinabove set out. While he was testifying in this vein, he volunteered testimony which has been already herein quoted, the admissibility of which does not appear to have been challenged by either an objection or a motion to strike, to-wit: "Of course, in this case if we had seen the woman in time and could have did that [blown the short, sharp blasts], might have done some good." Following this, and while an effort was perhaps being made to exploit it, the testimony which is complained of in appellant's third point was placed in evidence, to-wit: "Q. On this occasion you say if circumstances had been such so that you could see the woman, you might could have blown her out of the way? A. On my side I might have done something with that because there would be a few—a second there I would have had something to act on—if it had been on my side." And while accentuating the effectiveness of the short, sharp blasts of the whistle to attract attention, counsel for plaintiffs placed in evidence the testimony which is complained of in appellant's fourth point, to-wit:

"Q. Now, have you ever had to blow anybody off the tracks there in Livingston? A. Oh, yes, sir.

"Q. Those sharp blasts? A. Yes, sir.

"Q. And I suppose on most occasions if you use those sharp blasts, they will get off? A. Yes, sir."

■ The testimony complained of in appellant's third point was objected to as being a conclusion of the witness which invaded the province of the jury, and as being speculative "in that the witness would have no way of knowing where he would have first discovered the woman if she had been on his side or how far the train was from the woman when such dis-

covery might have been made." The latter ground of objection appears to be the one principally relied upon by appellant, and we are unable to subscribe to its validity. The engineer had first hand information of where the train was when the fireman hollered to him to "hold it," and had been apprised of where Mrs. Landrum was at that time. We think there can be no doubt that both he and the jury understood that in giving the testimony which is complained of he had in mind that if he had seen Mrs. Landrum at the same distance at which the fireman first saw her he might have been able by sounding short, sharp blasts of the whistle, to attract her attention in time for her to have gotten out of the way of the train safely. When the testimony is so construed, we are of the opinion that the other ground of objection to it is also rendered invalid. The engineer was peculiarly well fitted to render an opinion on whether the distance which separated the train and Mrs. Landrum when the latter's position of peril was first discovered by the fireman was sufficient in the prevailing circumstances to have permitted of blowing a distress signal in time for Mrs. Landrum to have heard it and acted on it.

■ If we should be in error in the views we have expressed, and if the testimony was erroneously admitted in evidence, we are nevertheless of the opinion the error was harmless. Virtually the same testimony was in evidence through the statement above quoted as having been volunteered by the witness; and the fireman expressed the opinion that there was in all probability sufficient time after he discovered and realized Mrs. Landrum's perilous position and before the train struck her to have allowed for distress whistling and for Mrs. Landrum to have removed herself from the danger zone. A great deal of other undisputed evidence could have served scarcely any other purpose than to convey to the jury the same thought. In the state of the record, therefore, we are of the opinion that appellant's rights were not prejudicially affected by the testimony complained of.

■ Appellant urges that the testimony complained of in its fourth point was inadmissible because the circumstances under which others had been "blown off the track" in Livingston were not shown to have been the same as or comparable to the circumstances surrounding the accident here involved. We are of the opinion, however, that the testimony was admissible to show generally the effectiveness of distress whistling, and to show the engineer's knowledge of the effectiveness of one means at his command which could have been resorted to in an effort to avoid the accident. The testimony also served to show the engineer's knowledge that the railroad in Livingston was used as a footpath by pedestrians, and it must be borne in mind that the engineer's conduct at the time of the accident here involved was subject to be weighed by the jury just as was the conduct of the fireman.

Appellant's third and fourth points are overruled.

■ We do not feel that we would be justified on the record before us in holding excessive the award of damages in the amount of $16,000 to each of the minor children, Lucille and Avis Leon Landrum, and therefore overrule appellant's second point. The children, a girl and a boy, were of the ages of 13 and 12 years respectively. Mrs. Landrum, according to the evidence, was only 30 years of age at the time of her death, was healthy, and had a life expectancy of 37.-74 years. She was regularly employed and was earning approximately $300 per month. She had worked at intervals since 1944 to help support her family. A "big part" of her earnings, according to the evidence, was spent on the children. Her husband's employment frequently required that he be away from home, and Mrs. Landrum had arranged her working hours so that she could be at home most of the time when the children were not in school. She cooked, sewed, washed and ironed for the children, and otherwise catered to their needs, wishes and entertainment. She counselled with them, encouraged and aided them in

their school work, and required that they attend church and Sunday School regularly.

 Neither the pecuniary benefits the children might have reasonably expected to receive from their mother, nor the value to them of her nurture, care, education and guidance can be measured in dollars and cents with either mathematical or legal certainty. For this reason the assessment of damages in this kind of case is a matter peculiarly within the province of the triers of the facts, and unless a jury's award of damages should be so clearly excessive as to amount to an abuse of discretion, we feel that it should not be disturbed.

The question actually involved in appellant's fifth and sixth points is whether on the evidence, an item of $195 expended for a steel grave vault for the deceased is recoverable. All other funeral expenses were stipulated. Appellant contends that there was no proof that a steel grave vault was a reasonable item, and that the costs of it was disproportionate to the value of deceased's estate.

Jack E. Tower, an undertaker from Round Rock, Texas, testified that in his opinion the amount expended for the vault was reasonable insofar as values are concerned. He also testified from what he knew of burials conducted in Polk County, where Mrs. Landrum lived and died, he considered the vault a reasonable burial item there. He admitted on cross-examination, however, that he did not know what was usual or customary regarding use of vaults in any community other than Round Rock. He testified that steel grave vaults are used in approximately ninety percent of the funerals conducted in Round Rock and vicinity. There was no evidence indicating that this percentage was in anywise attributable to any peculiarities of soil or water levels existing at or in the vicinity of Round Rock. It resulted from the choice of the people involved.

 Mrs. Landrum's husband or family chose to bury her in a steel vault and she was so buried. The expense of the vault should be recoverable, we think, if use of a vault, and if the vault used, was reasonably suitable to her station in life. The answer to neither of these questions was dependent on expert testimony. There was evidence before the jury as to Mrs. Landrum's public employment, her earning capacity, her wide acquaintanceship, her style of living, and other similar matters, sufficient, we think, to enable the jury to judge of her station in life and of the suitability thereto not only of the use of a vault in burying her but of the vault actually used. Appellant has not questioned the reasonableness of the amount expended for the vault used, but in any event we are of the opinion the testimony of the undertaker Tower, taken in connection with the charge actually made for the vault, was sufficient to support the jury's finding that the sum of $195 was reasonable. Appellant's fifth and sixth points are accordingly overruled.

No error being shown, the judgment of the trial court is in all things affirmed.