**ESTATE OF Horace CLIFTON, et al., Appellants,**

v.

**SOUTHERN PACIFIC TRANSPORTATION CO., Appellee.**

**No. 04–83–00127–CV.**

Court of Appeals of Texas, San Antonio.

Jan. 31, 1985.

Rehearing Denied March 6, 1985.

.

.

Dale Friend, Ronald Wardell, Fisher, Gallaagher, Perron & Lewis, Billy McAninch, John O'Quinn, Houston, for appellants.

Howard Newton, Matthews & Branscomb, Judith R. Blakeway, San Antonio, for appellee.

Before CADENA, C.J., and TIJERINA and REEVES, JJ.

## OPINION

REEVES, Justice.

James Bozeman, Horace Clifton and Ronald Athey were accidently killed while on a fishing trip in Val Verde County. The accident occurred when the van in which they were riding was struck by a freight train owned by Southern Pacific Transportation Company at a railroad crossing on Box Canyon Road. The train's engineer was Rusty Reams. Suit was instituted by Linda Clifton, widow of Clifton, individually and as legal representative of the estate of Clifton, and as next friend of their three minor children, Anthony Paul Clifton, David Wayne Clifton, and Julie Ann Clifton, and Clifton's mother, Ada Clifton Weatherly. Ronald Athey's widow, Diane Athey, individually and as legal representative of Athey's estate and as next friend of their three minor children, Jeffrey Athey, Kathy Athey and Michael Athey, and his parents, Mae and Elzie Athey, also sued the Railroad and its engineer.

Southern Pacific and Reams filed a third party action against the estate of James Bozeman alleging Bozeman was the driver of the van and was negligent in his operation of the vehicle. They sued Bozeman for contribution and/or indemnity on any judgment that might be rendered against them.[1] Thereafter, Clifton and Athey amended their pleadings to add the Bozeman estate as a defendant. Bozeman instituted a counterclaim against Southern Pacific and Reams.[2] The jury found that the railroad crossing at Box Canyon Road was extra hazardous and the failure of Southern Pacific to have flashing lights at the crossing to warn vehicular traffic was negligence and a proximate cause of the accident. The jury also found that the driver of the van was guilty of negligence, which negligence was a proximate cause of the accident in the following particulars: failure to keep a proper lookout, failure to timely apply the brakes, and stopping the van on the railroad track. The jury, however, failed to find that Bozeman was driving the van.

While the jury was deliberating its verdict, Clifton and Athey settled their case with the estate of Bozeman for $1,500,-000.00.

---

1. Southern Pacific and Reams also counterclaimed against the estate of Athey alleging that Athey was the driver of the van and sought contribution and/or indemnity on any judgment that might be rendered against them. This claim was severed by the trial court and is not subject to this appeal.

2. Engineer Reams is not involved in this appeal since the jury found no acts of negligence on his part.

The jury answered the damage issue as follows:

Linda Clifton (widow):

A. Care, maintenance, support, services, advice, counsel and contributions of a pecuniary value that Linda Clifton would in reasonable probability have received from Tony Clifton during his lifetime had he lived.

ANSWER: $500,000.00

B. Loss of companionship, society, affection, comfort, sexual relationship and love.

ANSWER: $250,000.00

Anthony Clifton (son):

A. Care, maintenance, support, services, education, advice, counsel and contributions of a pecuniary value that Anthony Clifton would in reasonable probability have received from Tony Clifton during his lifetime had he lived.

ANSWER: $25,000.00

B. Loss of companionship, society, affection, comfort and love.

ANSWER: $10,000.00.

David Wayne Clifton (son):

A. Care, maintenance, support, services, education, advice, counsel and contributions of a pecuniary value that David Clifton would in reasonable probability have received from Tony Clifton during his lifetime had he lived.

ANSWER: $50,000.00

B. Loss of companionship, society, affection, comfort and love.

ANSWER: $25,000.00.

Julie Clifton (daughter):

A. Care, maintenance, support, services, education, advice, counsel and contributions of a pecuniary value that Julie Clifton would in reasonable probability have received from Tony Clifton during his lifetime had he lived.

ANSWER: $50,000.00

B. Loss of companionship, society, affection, comfort and love.

ANSWER: $50,000.00.

Mrs. Ada Clifton Weatherly (mother):

A. Care, maintenance, support, services, advice, counsel and contributions of a pecuniary value that Ada Clifton Weatherly would in reasonable probability have received from Tony Clifton during his lifetime had he lived.

ANSWER: $5,000.00

B. Loss of companionship, society, affection, comfort and love.

ANSWER: $5,000.00.

Diane Athey (widow):

A. Care, maintenance, support, services, advice, counsel and contributions of a pecuniary value that Diane Athey would in reasonable probability have received from Ronald Athey during his lifetime had he lived.

ANSWER: $1,000,000.00

B. Loss of companionship, society, affection, comfort, sexual relationship and love.

ANSWER: $250,000.00

C. Mental suffering in the past and which in reasonable probability she will suffer in the future.

ANSWER: $10,000.00

Mr. Elzie Athey (father):

A. Care, maintenance, support, services, advice, counsel and contributions of a pecuniary value that Elzie Athey would in reasonable probability have received from Ronald Athey during his lifetime had he lived.

ANSWER: $2,500.00

B. Loss of companionship, society, affection, comfort and love.

ANSWER: $2,500.00

C. Mental suffering in the past and which in reasonable probability he will suffer in the future.

ANSWER: $500.00

Mrs. Mae Athey (mother):

A. Care, maintenance, support, services, advice, counsel and contributions of a pecuniary value that Mae Athey would in reasonable probability have received from Ronald Athey during his lifetime had he lived.

ANSWER: $2,500.00

B. Loss of companionship, society, affection, comfort and love.

ANSWER: $2,500.00

C. Mental suffering in the past and which in reasonable probability he [sic] will suffer in the future.

ANSWER: $500.00

Fay Bozeman (Widow):

A. Care, maintenance, support, services, advice, counsel and contributions of a pecuniary value that Fay Bozeman would in reasonable probability have received from James C. Bozeman during his lifetime had he lived.

ANSWER: $500,000.00

B. Loss of companionship, society, affection, comfort, sexual relationship and love.

ANSWER: $250,000.00

Amanda Bozeman (daughter):

A. Care, maintenance, support, services, education, advice, counsel and contributions of a pecuniary value that Amanda Bozeman would in reasonable probability have received from James C. Bozeman during his lifetime had he lived.

ANSWER: $35,000.00

B. Loss of companionship, society, affection, comfort and love.

ANSWER: $10,000.00

The jury also found that the conduct of the Southern Pacific constituted gross negligence, that such act was a proximate cause of the accident and awarded each of the appellants an additional $10,000.00 exemplary damages.

Southern Pacific filed a motion which the court granted to disregard the finding of damages for loss of companionship, society, affection, comfort, sexual relationship, love and mental suffering and the finding of gross negligence and exemplary damages.

## INTANGIBLE DAMAGES UNDER THE WRONGFUL DEATH STATUTE

The Bozemans, Cliftons and Atheys maintain error in the trial court denying their right to recover loss of companionship, society, affection, comfort and love, and in the case of the deceased's spouses, the loss of sexual relationship (loss of society). The Atheys also claim compensation for their mental suffering, some times referred to as mental anguish, endured in the past and which they would suffer in the future.

■ In *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex.1983), the Court established the law in Texas that a parent is entitled to compensation for the mental anguish suffered due to the loss of a child in a wrongful death action. Furthermore, the Court stated that thereafter a plaintiff could "recover damages for loss of companionship and society and damages for mental anguish for the death of his or her child." *Id.*, at 254. Implicit in *Sanchez* was the intent of the Supreme Court to extend this doctrine to the other members of that class who have a cause of action against a tort-feasor under the Wrongful Death Act.[3] The Court expressly overruled more than twenty (20) decisions of the Supreme Court of Texas which directly dealt with the Wrongful Death Statute, some of which denied recovery to other classes of claimants provided for under the statute. Some of the cases specifically overruled are: *J.A. Robinson Sons, Inc. v. Wigart*, 431 S.W.2d 327 (Tex.1968) (suit for wrongful death of spouse and father brought for loss of society by a wife and three minor children); *Tex-Jersey Oil Corp. v. Beck*, 157 Tex. 541, 549, 305 S.W.2d 162, 169 (Tex.1957) (suit by a daughter for the wrongful death of her mother wherein the jury was instructed not to consider sorrow and grief and loss of companionship or love and affection); *Gulf, Colorado & Santa Fe Railway Co. v. Farmer*, 102 Tex. 235, 239, 115 S.W. 260, 261 (Tex.1909) (suit by husband and daughter for the wrongful death of the wife and mother wherein recovery

---

3. TEX.REV.CIV.STAT.ANN. art. 4675, Title 77 (Vernon 1952), Injuries Resulting in Death, states, in part:

"Actions for damages arising from death shall be for the sole and exclusive benefit of and may be brought by the surviving husband, wife, children, and parents of the person whose death has been caused or by either of them for the benefit of all ...."

was limited only for the pecuniary loss and specifically excluded all recovery for the loss of society); *International & Great Northern Railway Co. v. McVey*, 99 Tex. 28, 32, 87 S.W. 328, 329 (Tex.1905) (suit by wife and children for the wrongful death of the husband and father wherein the jury was instructed to exclude recovery of any compensation for loss of society); *Merchants' & Planters' Oil Co. v. Burns*, 96 Tex. 573, 581, 74 S.W. 758, 761 (Tex.1903) (wife and mother suing for wrongful death of husband and son wherein jury was instructed not to consider loss of society).

■ Article 4671 provides "for actual damages on account of the injuries causing the death of any person . . ." The Supreme Court has now, in our opinion, expanded "actual damages" to include loss of society and mental anguish and we see no rational reason why the Court would exclude any member of the class or prefer one member of the class to the others. In *accord, Missouri Pacific Railroad Co. v. Dawson*, 662 S.W.2d 740 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.).

■ The Railroad alleges there was no evidence which would authorize the submission of the damage issue for loss of society and the damage on mental suffering or, as it is also referred to, mental anguish. In reviewing the evidence, we will consider only the evidence which, when viewed in the light most favorable, support the jury's finding and disregard all evidence leading to a contrary conclusion. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

■ Before examining the no evidence question, we will discuss the proof necessary to establish loss of society and mental anguish. The elements which comprise loss of society and mental anguish are similar, in part, in that the loss of love, companionship and the insecurity due to the lack of advice and support of a lost one can trigger a psychological problem on the part of the bereaved claimant. Be that as it may, mental suffering proof requires a showing of psychic and/or physical injuries directly inflicted upon the mind of the claimant. The distinction between loss of society and mental suffering was recognized in *Minyard Food Stores v. Newman*, 612 S.W.2d 198 (Tex.1980); *Gulf States Utilities Co. v. Reed*, 659 S.W.2d 849 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.).

In reviewing the evidence on loss of society, the statement of the court in *Whittlesey v. Miller*, 572 S.W.2d 665 (Tex.1978) is helpful.

> The loss of companionship, emotional support, love, felicity, and sexual relations are real, direct, and personal losses. [Citations omitted.] It is recognized that these terms concern subjective states which present some difficulty in translating the loss into a dollar amount. The loss, however, is a real one requiring compensation, and "the issue generally must be resolved by the 'impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence.'" [Citation omitted.]

572 S.W.2d at 667.

> It is well settled Texas law that
> Neither the pecuniary benefits the children might have reasonably expected to receive from their mother, nor the value to them of her nurture, care, education and guidance can be measured in dollars and cents with either mathematical or legal certainty. For this reason the assessment of damages in this kind of case is a matter peculiarly within the province of the triers of the facts, and unless the jury's award of damages should be so clearly excessive as to amount to an abuse of discretion, we feel that it should not be disturbed.

*Texas & N.O.R. Co. v. Landrum*, 264 S.W.2d 530, 539 (Tex.Civ.App.—Beaumont 1954, writ ref'd n.r.e.).

■ The evidence in support of the award of loss of society and mental suffering discloses each of the couples were blessed with, what is generally called, a good marriage. The fishing tournament they were attending is a good example. Bozeman, Clifton, Athey and their wives

were members of a fishing club called "Guys and Gals." Each married couple, as a team, would compete against other teams and other clubs. Each of the wives, as well as other witnesses, testified to instances of the families working and playing together. Each of the wives stated that her husband was the principal source of the income for the family and was relied upon for counsel and advice. The decedents were considered good fathers who loved their children and the evidence showed their children sought and heeded their counsel and advice.[4] There was testimony as to the close family relationship of the decedents to their families and particularly the physical and moral support of each of the fathers given to his children.

Clifton was survived by a mother and Athey was survived by a mother and father. There was a close relationship between the decedents and their parents. Mrs. Weatherly, Clifton's mother, testified that Horace Clifton was the oldest of seven children. She lived in a small town approximately 20 miles from Nacogdoches and he made it a point to visit her at least once a month and always on holidays. Clifton gave her a car in 1980. She sought and took his counsel on many things, especially financial matters. He prepared her income tax. As a result of this fatal accident she became ill with what she described as "a near breakdown" which required medical attention. She further testified that she continues to have emotional problems which directly relate to the death of her son.

Elzie Athey and his wife, May, lived in Lufkin which is approximately 20 miles from Nacogdoches, the resident city of Athey. Athey, along with his family, frequently visited with his mother and father and, when unable to visit in person, would talk with his parents by phone. Mr. Athey testified that he occasionally fished with his son and Ronald made repairs around the parents' home. Mrs. Athey supported her husband's testimony. She testified that, from time to time, Ronald would call her early in the morning and tell her to make some hot coffee, biscuits and gravy because he alone or with his stepchildren was coming over for breakfast. She missed this relationship very much and testified that it was horrible without it. Evidence established that Ronald Athey was an attentive son, and his death had created a void in his parents' lives.

We are of the opinion that there was evidence to support the submission of the special issue on loss of society.

■ Mrs. Diane Athey testified, as the result of the death of her husband, she had trouble sleeping at night, had been hospitalized for depression, and was under medical care. She further testified that since her husband's death she occasionally had difficulty in coping with the children, a problem she did not have prior to the death of her husband.

We are of the opinion that there is some evidence to support the submission of the mental suffering issue as to mental anguish of Mrs. Athey.

■ Our search of the record as to the mental anguish of Mr. Elzie Athey and Mrs. May Athey, parents of Ronald, fail to reveal any probative evidence in support of their allegation of mental suffering. Consequently, we are of the opinion that the trial court was correct in entering judgment denying mental suffering damages as to Mr. Elzie Athey and Mrs. May Athey.

PREJUDGMENT INTEREST

■ The Athey's assert error on the part of the trial court in not granting prejudgment interest on the compensatory damages. In calculating the compensatory damages the jury also considered his future earnings. Prejudgment interest is not permissible on future earnings because there could be no loss incurred by delaying the payment of future earnings from the

4. Athey was not the natural father of Mrs. Athey's children and no recovery was allowed to the stepchildren.

time of death until judgment is rendered. *Fisher v. Agios Nicolaos*, 628 F.2d 308, 319 (5th Cir.1980), *cert. denied*, 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981); *City of New York v. Bernstein*, 332 F.2d 1006, 1008 (2d Cir.1964), *cert. denied*, 379 U.S. 922, 85 S.Ct. 277, 13 L.Ed.2d 335 (1964). In addition to Athey's earnings, the award for compensatory damages included future compensation for loss of care, maintenance, advice and counsel. We affirm the trial court's judgment denying prejudgment interest.

## EXEMPLARY DAMAGES

The jury found that the railroad crossing was extra hazardous, and the failure of the railroad to have flashing signal lights at the crossing to alert vehicular traffic of an approaching train was negligence. The jury also found that the railroad was negligent in its failure to keep its right-of-way clear of weeds and vegetation but that this act of negligence was not a proximate cause of the accident. The jury found the train was not visible before the driver of the van reached a point fifteen feet from the nearest rail of the railroad track.

■■■ The jury also found that the conduct of the railroad constituted gross negligence which was a proximate cause of the collision and awarded each of the appellants $10,000.00 as exemplary damages. The railroad filed a motion for judgment n.o.v. contending there was no evidence to support the award of exemplary damages, which motion was granted by the court. In *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex.1981), the court stated:

Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it.

In reviewing a no evidence point relating to gross negligence, we are instructed:

When there is *some* evidence of defendant's entire want of care and also *some* evidence of "some care" by the defendant, the jury finding of gross negligence through the entire want of care resolves the issue, and the appellate court is bound by the finding in testing for legal sufficiency.

*Id.*, at 921.

■■■ We are further instructed:

In determining whether there is some evidence of the jury's finding of gross negligence, the reviewing court must look to all of the surrounding facts, circumstances, and conditions, not just individual elements or facts ... the existence of gross negligence need not rest upon a single, act or omission, but may result from a combination of negligent acts or omissions, and many circumstances and elements may be considered in determining whether an act constitutes gross negligence. A mental state may be inferred from actions. All actions or circumstances indicating a state of mind amounting to a conscious indifference must be examined in deciding if there is some evidence of gross negligence.

In making this determination, all evidence must be considered in a light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deductible from the evidence is to be indulged in such party's favor. [Citations omitted.]

*Id.*, at 922.

■■■ The essential ingredient which raises ordinary negligence to gross negligence and thereby authorizes a jury to award exemplary damages is the mental attitude of the defendant. It must be shown, "that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." *Id.*, at 920.

■■■ The trial court instructed the jury, in deliberating on the gross negligence issue, to consider only the negligence of the railroad in failing to have flashing lights at the crossing. We will, therefore, consider all the surrounding facts, circumstances

and conditions favorable to the finding of the jury that this type of warning device should have been erected and in use at the time of the accident.

West of the crossing where the accident occurred, the railroad had, in constructing the track, carved its right-of-way from a hill or a large mound of rock. In doing so, it left a wall or barrier which obscured the view of the engineer when the train was traveling east to a vehicle proceeding south, the direction the van was traveling at the time of the accident. It was described by some as a "blind crossing," in that a motorist traveling south on the road could not see an approaching train until the vehicle was actually on the railroad track. The track had been in use for some years and this condition was well known to the train's crew and supervisors. There had been, "one near miss before at this location." A conductor for the railroad testified the crossing was a little more dangerous than most due to the limited visibility.

The jury found the railroad company did fail to clear the right-of-way of weeds and vegetation, but such failure was not a proximate cause of the accident. Nevertheless, the high weeds in the right-of-way could obscure a driver's vision and can be considered in the overall review of the railroad's attitude toward this crossing. *Burk, supra,* at 920.

We conclude there is more than a scintilla of evidence to support the jury's findings of gross negligence to warrant the submission of the exemplary damage issue.

### EXCESSIVE DAMAGES

 The railroad suggests that a remittitur is in order in that the jury's award of damages to appellees for loss of society ranged from 25% to 100% of the awards for pecuniary losses, and, therefore, is excessive. The determination of the amount of the award rests with the jury and there is no set formula to follow. The award of the jury, however, is subject to review by the Court. We also recognize that there should be some uniformity as to the amount of verdicts and judgments in the various cases. *Kimbriel Produce Co. v. Webster,* 185 S.W.2d 198 (Tex.Civ.App.— San Antonio 1944, writ ref'd w.o.m.).

 We do not understand the relevancy of the ratio the award of pecuniary damages bears to the award for loss of society. The decedents were approximately the same ages, between 34 to 41 years, at the time of their deaths. Thus, the life expectancies were approximately the same. Two of the widows received $500,000.00 and one widow received $1,000,000.00 as pecuniary damages. Each received $250,000.00 for loss of society. The children and parents received from $500.00 to $50,000.00 as pecuniary damages and from $2,500.00 to $50,000.00 for loss of society. The record strongly indicates that the jury, in assessing loss of society, considered a number of factors such as the formative years of a child, and the loss to that child of the father's council, love and advice. The amount of the award, in general, diminishes as the age of the child increases. The jury was uniform in its application of such factors with the award for loss of society to the widows as well as to the children. In our opinion, the awards are not excessive.

### IDENTIFICATION OF THE VEHICLE'S DRIVER

The jury found that the driver of the van was negligent in his failure to keep a proper lookout, failure to apply his brakes and in stopping the van on a railroad crossing when a person using ordinary care would not have done so, and that each of the aforesaid negligent acts was a proximate cause of the accident. However, in response to the special issue inquiring if Bozeman was the driver of the van, the jury answered no. The jury found no acts of negligence attributable to engineer Reams. Consequently, the trial court attributed 100% of the negligence to the railroad.

The railroad filed a motion that the court disregard the finding Bozeman was not the driver of the van in that the evidence estab-

lished as a matter of law that Bozeman was the driver. The trial court denied the motion.

The following evidence will be reviewed in the following manner: first, the evidence will be viewed in its most favorable light that tends to support the jury's finding and all evidence leading to a contrary conclusion will be discarded. In other words, a "no evidence" review as mandated in *Garza v. Alviar, supra.* If we find more than a scintilla of probative evidence which supports the jury finding, the cross-point asserted by the railroad will be overruled. If, however, we find a scintilla or less of probative evidence to support the finding, then we will consider the entire record to determine if the contrary evidence establishes that Bozeman was the driver as a matter of law. *See Texas & N.O.R. Co. v. Burden,* 146 Tex. 109, 203 S.W.2d 522, 529–531 (Tex.1947); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEXAS L.REV. 361, 363–364 (1960).

■■■■ The railroad evidence is circumstantial. The court in *Lumbermen's Underwriting Alliance v. Bell,* 594 S.W.2d 569 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.) aptly sets forth these parameters governing circumstantial evidence:

> To establish a fact by circumstantial evidence the circumstances relied upon must have probative force sufficient to constitute a basis of legal inference; it is not enough that they raise a mere surmise or suspicion of the existence of the fact or permit a purely speculative conclusion. (Citations omitted)
>
> Although facts may be established circumstantially, the circumstances themselves must be shown by direct evidence, and cannot be inferred from other circumstances nor can a presumption of fact rest upon a fact presumed; in other words, it is not admissible to get into the domain of conjecture and pile one presumption upon another.

594 S.W.2d at 570.

■■ The following is a narrative of the uncontroverted evidence. The van was owned by Bozeman's employer, but Bozeman had the privilege of the use of the van during his leisure time. He drove the van from his home to Val Verde County and was the driver of the van when he and his two other fishing buddies, Athey and Clifton, left to check the boat ramp on Lake Amistad. Mrs. Clifton testified that the three couples, each driving separate vehicles, arrived at a motel in Val Verde County approximately 5:30 P.M. and that shortly thereafter, at approximately 5:45 P.M. to 5:50 P.M., Bozeman, Athey and Clifton left to check out a boat ramp where they intended to launch their boats the next morning. The fatal accident occurred sometime before 6:20 P.M. At the time of their departure from the motel, Bozeman was driving, Clifton was sitting in the front passenger seat and Athey was seated immediately behind the driver's seat.

Favorable to a finding that Bozeman was not the driver is the following. A witness, Gene Blount, testified that on the day of the accident, he was travelling north on Box Canyon Road and was flagged down by a driver of a van. He estimated the time to be a few minutes after 5:00 P.M. The occupants of the van were looking for a boat ramp. Blount observed there were two passengers in the van, a man in the front seat next to the driver, and a person in the back seat. He could not determine whether the occupant in the back seat was a man or a woman as the back window was dark, thereby obfuscating his view. The window on the driver's side was rolled down and the driver of the van and Blount were approximately three feet apart. Blount described the driver as young, approximately 34 years of age, that his hair was sort of light and short and curly. He had a full face. He could not recall if the driver had a beard or mustache. The van driver was not wearing glasses.

The testimony and physical evidence established that Clifton, 41 years of age, was bald-headed with hair on temples and the back of his head. Athey, 34 years of age, had a beard and mustache. Bozeman, 40

years of age, had black hair and was clean shaven.

Although we review Blount's testimony in its most favorable light in support of the finding, giving effect to all reasonable inferences that may be properly drawn therefrom, we would be taking his testimony out of context and distorting it if we did not review his entire testimony. When asked if he could identify the driver if shown a picture of the man who was driving the van, he replied that he doubted it. When asked if shown the three pictures of the men who died in the accident, could he pick out the driver, he replied, "No sir, it would be highly unlikely."

Deputy Sheriff Johnny Rodriguez, Val Verde County Sheriff's office was dispatched to the scene of the accident approximately 6:20 P.M. Upon arriving at the scene, he found the van, which had been struck broadside by the train on the passenger side, situated approximately 228 feet east of the crossing. He testified that the van was pointing in a northerly direction, indicating the van had turned approximately 180 degrees after impact. He also testified that, in his opinion, the van had turned over at least once and possibly several times. He found the van lying on the driver's side to the ground. Bozeman's body was lying against the door on the driver's side, Clifton's body was lying on top of Bozeman and Athey's body was about two feet to the rear of Bozeman. All three bodies were situated on the left hand or driver's side of the van.

Rodriguez, based on the physical evidence, surmised that Bozeman was the driver of the van and placed that information in his report. He testified that he couldn't be positive that Bozeman was the driver since he was not found sitting in the driver's seat behind the wheel.

We are of the opinion that there is less than a scintilla of evidence that someone else other than Bozeman was driving the van at the time of the accident. We will, therefore, consider the evidence which would support the assertion that Bozeman was the driver of the van.

Charles Rubel, an accident analyst, testified the van was impacted on the passenger side, and, in his opinion, became attached to the front of the engine and was carried 228 feet down the track where it became dislodged, rolled up on its top, continued to slide on its top until it came to a resting place approximately 20 feet south of the south rail, and then rolled back over on the driver's side. He theorized that the van did not roll over completely as there was no evidence on the impact side of the van that it ever came in contact with any dirt or other elements in the terrain. Conversely, the driver's side of the van revealed evidence of dirt and other debris from the track which indicated the van stayed attached to the front of the engine as it was pushed down the track. The bodies were in the same positions the men were in when they left their Del Rio motel shortly before the accident. We conclude, as a matter of law, that Bozeman was the driver of the van at the time of the fatal accident.

## FAILURE OF RAILROAD TO RECEIVE SETTLEMENT CREDIT

After the case had been submitted to the jury but before it returned a verdict, Athey and Clifton settled with Bozeman for $1.5 million dollars. The comparative negligence issue was conditioned on attributing fault between Bozeman, Reams and the railroad. Since the jury found Reams not negligent and Bozeman not the driver of the van, the jury did not answer the comparative negligence question and the trial court attributed 100% of the fault to the railroad. The appellants propose that we reverse the trial court's judgment in denying them their loss of society and exemplary damages and render judgment on the jury verdict. This we cannot do. The jury has found the driver of the van and the railroad responsible for acts of negligence which proximately caused the collision and we have found Bozeman, as a matter of law, the driver of the van. Therefore, some fault must be attributable to Bozeman in order for the railroad to receive its

proper credit pursuant to TEX.REV.CIV. STAT.ANN. art. 2212a.[5]

TEX.R.CIV.P. 434 provides, in part,

When the judgment or decree of the court below shall be reversed, the court shall proceed to render such judgment or decree as the court below should have rendered, except when it is necessary that some matter of fact be ascertained or the damage to be assessed or the matter to be decreed is uncertain, in either of which cases the cause shall be remanded for a new trial.

Because this fact issue has not been determined, we are unable to render judgment and this cause must be remanded. We are cognizant that neither appellant nor appellee has prayed for a remand. However, it is the duty of the appellate court to reverse and remand a cause when a fact issue necessary to a judgment is unresolved. Furthermore, the ends of justice would be better served by reversing and remanding the cause for new trial. *National Life and Accident Insurance Co. v. Blagg*, 438 S.W.2d 905, 909 (Tex.1969); *London Terrace, Inc. v. McAlister*, 142 Tex. 608, 180 S.W.2d 619, 620–21 (1944); *Groves v. Hanks*, 546 S.W.2d 638, 649–650 (Tex.Civ. App.—Corpus Christi 1976, writ ref'd n.r. e.).

The judgment of the trial court is reversed and the cause remanded for new trial not inconsistent with this opinion. Costs are taxed one-half to appellant and one-half to appellee.

TIJERINA, Justice, dissenting.

I respectfully dissent.

The majority has concluded that Bozeman was the driver as a matter of law. Special Issue 14 was phrased as follows:

Was James C. Bozeman the driver of the van at the time of the collision in question?

Answer "Yes" or "no".

Answer: NO

This was a defensive issue; the railroad had the burden of proving by a preponderance of the evidence that Bozeman was the driver. *Allied Finance Co. v. Gammill*, 440 S.W.2d 897, 900 (Tex.Civ.App.—Fort Worth 1969, writ ref'd n.r.e.). The jury had the opportunity to observe the witnesses and to weigh their testimony. The witness Blount testified that on the date of the accident a few minutes after five he was stopped by the driver of a van who asked for directions to the boat ramp. He said he saw a total of three (3) persons in the van. The following testimony is relevant to this question:

A: If you were shown pictures of all three of the men who were in the van, assuming that there were three men in the van, do you think it would be possible for you to pick out the man who was the driver?

A: No Sir. It would be highly unlikely.

The witness Blount said the nearest description he could give of the driver was

---

5. TEX.REV.CIV.STAT.ANN. art. 2212a § 2 provides in pertinent part:

(b) In a case in which there is more than one defendant, and the claimant's negligence does not exceed the total negligence of all defendants, contribution to the damages awarded to the claimant shall be in proportion to the percentage of negligence attributable to each defendant.

(c) Each defendant is jointly and severally liable for the entire amount of the judgment awarded the claimant, except the defendant whose negligence is less than that of the claimant is liable to the claimant only for that portion of the judgment which represents the percentage of negligence attributable to him.

(d) If an alleged joint tort-feasor pays an amount to a claimant in settlement, but is never joined as a party defendant, or having been joined, is dismissed or nonsuited after settlement with the claimant (for which reason the existence and amount of his negligence are not submitted to the jury), each defendant is entitled to deduct from the amount for which he is liable to the claimant a percentage of the amount of the settlement based on the relationship the defendant's own negligence bears to the total negligence of all defendants.

(e) If an alleged joint tort-feasor makes a settlement with a claimant but nevertheless is joined as a party defendant at the time of the submission of the case to the jury (so that the existence and amount of his negligence are submitted to the jury) and his percentage of negligence is found by the jury, the settlement is a complete release of the portion of the judgment attributable to the percentage of negligence found on the part of that joint tort-feasor.

that he had a full head of hair, a medium build, and a full face. This description fit Bozeman or Athey. He said he did not remember saying that the driver had facial hair but that he could have said so. The following colloquy is pertinent:

Q: Okay. Let me ask you to try to remember back as close to the accident as you can on whether—when you are talking about facial hair, are you talking about a beard, are you talking about a moustache or which?

A: Both.

Q: Both?

A: Yes, sir.

Q: Was it a full moustache or what or was it just like a two day growth?

A: I couldn't even say he had a moustache for sure.

Rodriguez, the police officer, was asked on cross-examination if there was any doubt on his mind, based on his observations at the scene, that Bozeman was the driver. He replied: "To be honest with you, I can't put him on the steering wheel." He further stated that he could not be absolutely positive because Bozeman was not sitting in the driver's seat behind the wheel and *the van after impact tumbled two or three times.* With reference to the police report, Rodriguez stated that he located and identified a body close to the driver's position and wrote "Bozeman" as the driver. Counsel then inquired, *"You are not telling this jury you know who was driving the van?"* He answered, *"No, sir."*

When the party having the burden of proof appeals from an adverse fact finding in the trial court, the point of error should be that the matter was established as a matter of law or that the jury finding was against the great weight and preponderance of the evidence. Where there is some evidence which contradicts the assertion, the matter is not established conclusively. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). In the instant case, the railroad, the party with the burden of proving Bozeman as driver, failed to establish by a preponderance of the evidence that he was

the driver. Their point of error on appeal was that the jury finding at issue was erroneous because the evidence establishes as a matter of law that Bozeman was the driver. The testimony of Blount and the police officer on cross-examination constituted *some evidence that Bozeman was not the driver.* A reasonable inference from this evidence would be that Athey was the driver. Athey had a full head of hair and otherwise fit the description of the driver as given by Blount; Athey was the only one of the three occupants who had a beard. The jury in the exercise of their prerogative apparently considered the engineer and the reconstruction specialist to be interested witnesses and disregarded their testimony. The railroad did not assert a great weight and preponderance point of error, so we are not concerned with the quantum of evidence required to make that determination.

The railroad relies on circumstantial evidence to establish their onerous burden of proving that Bozeman was the driver as a matter of law. Texas law requires that the circumstances relied upon must have probative force sufficient to constitute a basis of legal inference; it is not enough that they raise a mere surmise or suspicion of the existence of the fact or permit a purely speculative conclusion. *Lumbermen's Underwriting Alliance v. Bell*, 594 S.W.2d 569, 571 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.). A fact finder has implied finding power and can make a reasonable inference from the direct or circumstantial evidence. *Harrison v. Harrison*, 597 S.W.2d 477, 481 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.). The review of this record clearly shows the existence of a genuine fact issue on this question and there is sufficient evidence to support the jury finding.

Special Issue 25, the percentage of negligence issue, was predicated on the jury finding more than one party negligent. The jury found that the railroad crossing was "extra-hazardous", that the railroad was negligent for failure to have flashing signal lights at the crossing, and that such

negligence was a proximate cause of the occurrence. With reference to Special Issue No. 2, the failure to have flashing signal lights, the jury found that such conduct on the part of the railroad constituted gross-negligence. The jury also found that the driver of the van was negligent in failing to keep a proper lookout, failing to properly apply his brakes, and failing to timely stop the van at the crossing. Such negligence was found to be a proximate cause of the collision. However, since the jury found that Bozeman was not the driver, he could not be guilty of negligence. Therefore, the only party subject to assessment of damages was the railroad. The supreme court in *Cypress Creek Utility Service Co. v. Muller*, 640 S.W.2d 860, 865 (Tex.1982), held: "The policy of the comparative negligence statute is to apportion all damages in relation to the percentage of fault found by the jury." Accordingly, the judgment is correct in assessing all the damages against the railroad, the only party found negligent.

For the reasons indicated, I would affirm the judgment.